512 F.Supp. 46 (1981)
Carolyn P. SMITH, Plaintiff,
v.
The FLESH COMPANY, INC., Defendant.
No. 79-211C(3).
United States District Court, E. D. Missouri, E. D.
January 12, 1981.
On Motion for Reconsideration and Clarification April 3, 1981.
*47 Melba I. Parente, Clayton, Mo., for plaintiff.
David F. Yates, St. Louis, Mo., for defendant.

MEMORANDUM
FILIPPINE, District Judge.
This matter is before the Court for a decision on the merits after trial to the Court. Plaintiff brings this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq., claiming that the defendant, her former employer, discriminated against her in numerous ways, including her discharge, because of her sex and her age. After consideration of the pleadings, the testimony and exhibits introduced at trial, the parties' briefs and the applicable law, the Court makes the following findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52:

FINDINGS OF FACT
Plaintiff, Carolyn P. Smith, is a female resident of the United States and was, during all times relevant hereto, a resident of the Eastern District of Missouri. Plaintiff was born on January 26, 1933. She attended Arkansas State University for 3¾ years but did not receive a college degree. Plaintiff had taught school for ten years and had worked in the credit and accounts departments of two companies before going to work for defendant.
The defendant, The Flesh Company, Inc., is a Missouri corporation, engaged in the business of manufacturing and selling business forms. Defendant is an employer, is engaged in an industry affecting commerce, and at all times relevant hereto employed at least twenty-five persons. The defendant, up until 1977, was organized thusly in three general departments: 1  Direct Sales (to customers); 2  Production (which included Dealer Sales (sales to distributors, for resale), the order entry process, and the actual printing process); and 3  Administration.
Plaintiff was hired by defendant on March 29, 1965 to assist Royal "Scud" Flesh and Carl Roesel in the Direct Sales department. Her salary was $335.00 per month. "Scud" Flesh and Roesel were then defendant's President and Vice President, respectively. Two weeks after starting work for defendant, plaintiff was moved to the Dealer Sales division of the Production department as an Order Entry Clerk.
On January 1, 1967, plaintiff was promoted by "Scud" Flesh to Supervisor of the Production office at a salary of $450.00 per month. She continued to hold this title for the next ten years, the remainder of her *48 tenure with the defendant. The Production office employed six females at that time. One employee performed the function of plant payroll, another handled freight billing, a third covered plant inventory control, and the remaining three employees were responsible for the entry of production orders from dealers. In 1967, there were also approximately 20 men and four women employed in the plant itself. All departments of the defendant, including the plant, were located in one building on January Avenue in St. Louis.
Plaintiff's duties as Supervisor included the "order entry" function, that is, writing up the orders that came in from dealers over the phone or by mail. Her immediate superior was Russell Schwarz, who held two titles: Plant Manager and Vice President of Production. Plaintiff was the direct supervisor of the employees in order entry, and Schwarz was responsible for the entire Production office, including the supervision of plaintiff. Schwarz's main responsibilities were, however, in the plant: scheduling and supervising production, shipping, receiving, warehousing, and ordering supplies. Schwarz was a long-time employee of the company, having started in 1954 or 1955. Schwarz had a background in lithography before coming to work for defendant.
When Schwarz was off for his vacations, one month out of each year, plaintiff did the clerical aspects of his job for him. This included assuring shipment of orders, checking copy, proof reading, and handling customer complaints. Additionally, after Schwarz had a heart attack, in October, 1973, he was absent a good bit and plaintiff helped cover these clerical tasks for him then. However, Ronald Watson, the plant foreman, took over the plant aspects of Schwarz's job during the latter's absence. Plaintiff and Watson together took care of scheduling orders.
At some point after Schwarz's heart attack in October of 1973, defendant decided to hire someone as an Assistant to the Vice President of Production to help Schwarz. Defendant hired a former CIA agent, David Brickler, as the Assistant. Brickler began work on March 4, 1974. Plaintiff helped train Brickler in the clerical aspects of the job, and Ron Watson, plant foreman, trained him in the plant. However, due to the loss of Schwarz, Brickler's training did not succeed, and he was fired in April, 1975.
Plaintiff had mentioned to Schwarz that she would be interested in the position for which Brickler was hired, and Schwarz told her she did not have enough education. However, "Scud" Flesh, who had the authority to hire the Assistant, did not consider plaintiff for the job because that would have entailed training someone to fill plaintiff's job as well as training plaintiff for Schwarz's job. Plaintiff did not ask "Scud" Flesh for the job.
The position of Plant Manager vacated by Schwarz's death was eventually assumed by Ron Watson. However, in the fall of 1975, Watson asked to return to his former position, and he was allowed to do so. In January, 1976, Don Burrow was hired to fill the position of Plant Manager. Burrow had approximately 19 years' experience in the technical and mechanical aspects of business forms production, at least 15 of which had been in a supervisory capacity. On January 1, 1978, Burrow also became Vice President of Production, a title which had been vacant since Schwarz's death. Although plaintiff asked Roy Flesh II, "Scud's" grandson, then defendant's Comptroller, for the job of Plant Manager, plaintiff was clearly not qualified for the job because she had no experience in the plant.
Shortly after Carl Roesel became President of defendant in August, 1975, he and Paul Edwards, then Vice President of Sales, had discussions about means of improving the Dealer Sales department. Edwards requested that plaintiff prepare a report discussing the following areas: department responsibilities; strengths and weaknesses of each individual in the department; and recommendations of necessary improvements to achieve greater efficiency by using existing personnel.
Plaintiff responded in writing by saying she had "no recommendations how to improve the present conditions in order to *49 achieve greater efficiency," that she felt "each and every girl works to full capacity," and further that "each person in this department will get the job done," and that she did "not see the need to make changes when the things we are now doing work satisfactory [sic]." Defendant's President, Carl Roesel, disagreed with plaintiff's conclusions and was unhappy that plaintiff as Supervisor of the Dealer Sales department did not have any suggestions on how to achieve greater efficiency within the department.
Ron Watson, who was then Plant Manager, was not in a supervisory position over plaintiff or the Dealer Sales department. In order to fill the supervisory gap left by Schwarz's death, and in order to try to increase sales and provide better coordination between Dealer Sales and the plant, defendant hired David Wandling in October, 1975, to fill a new position: Production Office Coordinator. Wandling had only 15 hours of college education. However, he had worked as a collator operator in a forms factory for five years and had worked for three years as a forms salesman. He was familiar with the technical aspects of form production. He had first applied for a job with defendant in July, 1975, and had been told there were no openings. However, he continued to inquire about an opening and his persistence was finally rewarded.
Plaintiff was not considered for the position by Carl Roesel, then defendant's President, because she was not considered capable of handling it. Moreover, she did not ask to fill the position.
Wandling was trained into his job primarily by Edwards, Vice President of Sales. In addition, plaintiff explained the order entry forms to him and Ronald Watson showed him other aspects of the job. Wandling was responsible for supervising everyone in the Production office, including the Order Entry Clerks and the inventory control and payroll employees. He checked the production orders written by the Order Entry Clerks and gave them guidance on difficult orders. Wandling did not write any orders himself; he did solicit orders from dealers by calling them. In effect, Wandling assumed some of the aspects of plaintiff's job, although in part he was merely filling the gap left by Schwarz's death and in part he was providing a new function of solicitation of sales.
Wandling suffers from some colorblindness, and he occasionally had to ask plaintiff and others to distinguish colors on orders. However, matching colors is a production function and Wandling's colorblindness did not cause any problems.
On April 13, 1976, Carl Roesel, defendant's President, put out a memo to all employees stating in part that "[e]ffective immediately, Don [Burrow, Plant Manager] will assume total responsibility of supervising our Sales Order Entry Department" and stressing the importance of coordination between that department and the remainder of Production. Dave Wandling, who had reported directly to Paul Edwards, now reported to Burrow.
On January 7, 1977, plaintiff and other employees in the Production department were called to a meeting and told that in May, 1977, the Production plant was going to be moved to Parsons, Kansas. The defendant had part ownership of a printing company located there, and it had determined that it would be in a better competitive position if the two printing operations were able to share facilities. At the time of this announcement, no decision had yet been made on whether the Dealer Sales division should also move to Kansas or whether it should remain in St. Louis. However, on January 10, Carl Roesel told the plaintiff she was a valuable employee and that he desired to keep her.
In February of 1977, the Dealer Sales branch of the Production office was moved from the January Avenue building to the building behind it, which the company had bought in 1974, to determine whether the Production plant and office could function efficiently in separate locations. This move meant that Dealer Sales was no longer a branch of the Production department. On February 24, 1977, Roesel issued a bulletin *50 announcing that Wandling was the "Sales Order Entry Supervisor" and was responsible (again) to Paul Edwards. Some time in April, 1977, when it appeared that this separate arrangement would be satisfactory, the decision was made to retain Dealer Sales in St. Louis.
However, on May 17, 1977, plaintiff, and two other order entry clerks, Marie Wolf and Alice Roberson, were called into Carl Roesel's office. With tears in his eyes, Roesel informed them that their department (the Order Entry branch of the Production department) was being moved to Parsons, Kansas to the site of the plant, and that they were all to be terminated as of June 3, 1977. There was no criticism of their work. Plaintiff's last day of work for defendant was June 3, 1977.
In March, 1977, Paul Edwards, who was then Vice President of Sales, had made a written recommendation to defendant's Board of Directors for "reorganization" of the Dealer Sales branch. Edwards recommended, inter alia, that the four positions occupied by plaintiff, Marie Wolf, Alice Roberson and Dave Wandling, at monthly salaries of $930.00, $850.00, $600.00 and $1,100.00 respectively, be restructured into two salesmen positions at a monthly salary of $1,150.00 each, plus commissions, and two secretarial positions at a monthly salary of $500.00 each. The report also suggested that "Carolyn [plaintiff], Marie and Alice probably would not" be considered for any of the new positions, but that Jim Ford, who worked in the order scheduling department, and Dave Wandling "possibly, or perhaps probably" would be considered because they had "acquired the basic production knowledge" required for the job.
Although Edwards' lengthy recommendations were not adopted in their entirety, the defendant's Board of Directors did decide to "reorganize" the Dealer Sales department. As defendant's President, Carl Roesel, testified, the "reorganization" consisted in hiring new people to replace those fired as of June 3. On May 23, 1977, Kenneth Huckaby and Steven J. Krewson were entered on the defendant's payroll as the salesmen or, officially, "Account Executives" in the Production department. They were recruited from local colleges and were about to graduate. Neither had any experience in the forms business, and they were secretly trained by Edwards at a Howard Johnson Motel in St. Louis, a few blocks from the defendant's offices. At the same time, on May 23, 1977, two young women were hired as secretaries in the Dealer Sales department. Huckaby was started by defendant at a salary of $900.00 per month; Krewson started at $750.00 per month. Huckaby's salary increased to $950.00 per month on October 1, 1977. The duties of the "Account Executives" were the same as those of the former "Order Entry" clerks, except that their secretarial duties, such as typing and filing, were obviously delegated to the two secretaries.
Plaintiff was still employed by defendant on May 25, 1977 when two dealer sales orders priced by Huckaby and Krewson came to her attention. She did not know who the men were and she telephoned the plant to see if they were employed in Parsons, Kansas. They were not.
On June 1, 1977, David Wandling's title was changed to "Account Executive" and he was given a salary increase to $1,225.00 per month. Technically, he was no longer a supervisor; rather Edwards had responsibility for supervising Dealer Sales.
Plaintiff's department was not moved to Parsons, Kansas. The Dealer Sales branch of the Production department is still located in St. Louis. David Wandling became Supervisor of Dealer Sales on April 1, 1979, and still holds that position.
Plaintiff requested a service letter from the defendant. The service letter, which was dated September 6, 1977, stated in part:
Your employment with The Flesh Company was terminated due to the reorganization of the department in which you worked, which was done at the same time that a company-wide reorganization took place. After the departmental reorganization, the duties performed by employees in the department were changed and *51 the company believed, in light of your training and experience with the company, that you would not be qualified to undertake the new duties which were required by the new jobs created by the reorganization.
No other reason for plaintiff's discharge was stated in the letter.
Plaintiff had never been informed, prior to her discharge, that there was to be a "reorganization," nor was she ever offered the opportunity to move to Kansas. While defendant tried to show that there was an "attitude" or a complacency problem in the Dealer Sales department that led to the "reorganization," plaintiff herself was never told she had a poor attitude. In early 1976, when David Wandling suggested to all the order writers, including plaintiff, that they initiate phone contact with dealers to try to improve sales, the response was that there was no time. The order writers were responsible for filing and their own typing, and one of the order writers did Wandling's typing. There was no evidence that the order writers did in fact have spare time that they could have devoted to soliciting sales.
The only real criticism of plaintiff's performance at work had been that she made too many personal phone calls; Don Burrow mentioned this once to her in mid-1976 and Wandling also mentioned it to the plaintiff in early 1976. However, the evidence was that the vast majority of defendant's orders came in by mail, and in any case, there was no evidence that plaintiff's personal phone calls seriously interfered with her job performance or required her discharge. Nor was the evidence persuasive that occasional delays in getting filing done and in writing up orders by the Production office were a serious problem.
Moreover, plaintiff was Secretary of the defendant's Profit Sharing Plan Committee from 1968 to 1977, attended three conventions on behalf of the Company to promote business, received several bonuses, and was selected by Roy Flesh II in 1974 to be correspondent from the Dealer Sales division for a planned in-house publication (which did not materialize). She received a Christmas note from "Scud" Flesh in 1973 thanking her for "a job well done" and a Christmas note from "Scud" Flesh in 1974, with her bonus, stating "Your work has been excellent and your attention to your responsibilities are recognized and appreciated. Keep up the good work." While the evidence indicated that plaintiff had in fact lost most of her responsibilities as Supervisor as of the time of her discharge, the evidence also was clear that plaintiff was fully competent in performing her order entry clerk duties and that she was in fact a valuable employee.
On July 20, 1977, plaintiff went to the Department of Labor, and explained that she had been discharged and replaced by younger males. The Department of Labor employee referred plaintiff to the Equal Employment Opportunity Commission (EEOC). That same day, plaintiff went to the EEOC and filed a charge there. Her original handwritten charge contained allegations related to denial of promotion and equal pay as well as discriminatory discharge on account of sex. Plaintiff's charge, as typed by the EEOC intake office, set forth only the discharge claim, but the EEOC later requested that questionnaires be completed on denial of promotion and equal wages for the purpose of investigation. Plaintiff completed the questionnaires in April of 1978 and returned them to the EEOC. On October 24, 1978, the EEOC issued a letter of determination to the parties finding reasonable cause to believe that plaintiff's charge was true, and on January 18, 1979, plaintiff received a Notice of Right to Sue from the EEOC. She brought this action on February 26, 1979.
On August 16, 1978, more than a year after her discharge, plaintiff sent a charge of age discrimination and notice of intent to file a lawsuit to the Secretary of Labor. A poster stating that it was unlawful to discriminate against persons over the age of 40 had been posted on the bulletin board just outside of defendant's lunch room, which plaintiff used almost daily, at least since *52 David Wandling began working for defendant in October, 1975.
Plaintiff received six weeks' severance pay from defendant when she was terminated. This amounted to $1,287.72.
On June 6, 1977, plaintiff was hired by Stephens Business Forms as an Order Entry Clerk at $750.00 per month. Stephens went out of business less than four months later, on September 30, 1977, and plaintiff was laid off. Plaintiff's total earnings at Stephens were $3,224.38.
On October 7, 1977, plaintiff was hired by O'Malley Business Forms as General Manager. She was terminated on July 5, 1978. Plaintiff's total earnings from O'Malley were $1,925.00 in 1977 and $5,855.08 in 1978.
Plaintiff was unemployed for 13 weeks from July, 1978 to October, 1978 and she collected $85.00 per week in unemployment benefits, for a total of $1,105.00.
On October 17, 1978, plaintiff was hired as a payroll clerk by Missouri State Hospital at $655.00 per month. She resigned on March 30, 1979 to accept her next job. Plaintiff's total earnings at the State Hospital were $2,201.68 in 1978 and $3,256.62 in 1979.
On April 2, 1979, plaintiff was hired by Forms World, Incorporated as an Order Administrator at a monthly salary of $850.00. Six weeks later her salary was increased to $900.00. Plaintiff is still employed by Forms World at a salary of $900.00 per month. Plaintiff's total earnings at Forms World were $8,025.00 in 1979 and $10,800.00 in 1980.
As of the time of trial, the positions of Credit Manager, Head of Accounting, Head of Billing, and Manager of Data Processing at defendant were filled by women. In addition, one of the Account Executives in the Dealer Sales department was a woman.

CONCLUSIONS OF LAW
The Court has jurisdiction over Count I of this action pursuant to 42 U.S.C. § 2000e-5.
As to Count I, the Court finds that plaintiff made a prima facie case of sex discrimination in her discharge by showing that she is a woman, that she was fully capable of performing her order entry clerk duties with defendant, that she was discharged, and that the defendant sought people (Huckaby and Krewson) with her general qualifications to fill her job. Osborne v. Cleland, 620 F.2d 195 (8th Cir. 1980). There was absolutely no showing that possession of a college degree was in any way necessary for the "Account Executive" position.
Furthermore, the Court finds that defendant did not rebut the inference of sex discrimination thus raised by plaintiff. Although defendant attempted to show that plaintiff's discharge was necessitated by its "reorganization," it was clear that in fact the reorganization simply consisted in firing plaintiff, Alice Roberson, and Marie Wolf, and hiring two male "Account Executives" and two female secretaries. Thus the "reorganization" provides no reason at all for plaintiff's discharge. While defendant also attempted to show that it needed more aggressive Dealer Sales personnel, who would spend time soliciting orders, the Court was not persuaded that plaintiff or the other order entry personnel in fact had the time to solicit orders, or that they had ever received clear directions (as opposed to mere suggestions) that they solicit sales.
Accordingly, the Court finds that defendant violated 42 U.S.C. § 2000e-2 by discharging plaintiff at least in part because of her sex.
However, the Court cannot find for plaintiff on her other claims of sex discrimination. Plaintiff simply was not qualified for the positions of Plant Manager and Vice President of Production, and the Court finds that it was plaintiff's lack of qualifications, rather than her sex, that prevented her promotion. As for the position of Production Office Coordinator, assumed by David Wandling, the Court was not persuaded that plaintiff asked for the job, nor has the Court found that Wandling's job was exactly the same as plaintiff's so that a difference in plaintiff's and Wandling's pay was material. Disparities between the *53 plaintiff's salary and those of Russell Schwarz, David Brickler, and Donald Burrow were similarly irrelevant.
There was no evidence that defendant discriminated against plaintiff because she opposed defendant's sexually discriminatory practices. Plaintiff did show that in January, 1973, when plaintiff's sister was fired from her job with defendant, plaintiff was very upset and that "Scud" Flesh told her to be careful of her attitude, but there was no evidence that plaintiff was ever discriminated against because of this incident. Nor can the Court find that plaintiff was humiliated or assigned "burdensome tasks" because of any opposition to sex discrimination at defendant.
The plaintiff has requested reinstatement in her job with defendant with back pay at 8% prejudgment interest. The Court finds that reinstatement is appropriate. Because the plaintiff's duties were essentially the same as those of Huckaby and Krewson, hired on May 23, 1977, the Court finds, for purposes of figuring plaintiff's back pay, that the relevant comparison is to their salaries. Huckaby earned $900.00 per month up until October 1, 1977, when his salary increased to $950.00. Although Huckaby resigned in 1978, Krewson is still employed by defendant, earning a salary of $950.00 per month. Accordingly, the Court finds that plaintiff's salary at defendant would have been $930.00 per month (her salary at the time of her discharge) for June through September of 1977, and that starting in October, 1977, it would have been $950.00 per month.
Plaintiff received $1,287.72 in severance pay from defendant in 1977 and $1,105.00 in unemployment benefits in 1978. The Court finds that deductions from plaintiff's recovery should be made both for her severance pay, Laugesen v. Anaconda Company, 510 F.2d 307, 317 (6th Cir.), cert. denied 422 U.S. 1045, 95 S.Ct. 2665, 45 L.Ed.2d 697 (1975), and her unemployment benefits, Taylor v. Teletype Corp., 478 F.Supp. 1227 (E.D.Ark.1979). In addition, the Court finds that the "make whole" purpose of Title VII justifies an award of prejudgment interest, Vant Hul v. City of Dell Rapids, 465 F.Supp. 1231 (D.S.D.1979); United States v. Lee Way Motor Freight, Inc., 625 F.2d 918, 940 (10th Cir. 1979), and the Court will award plaintiff prejudgment interest of 8% per annum from the end of each year preceding this judgment, as follows:
In 1977, from June through September, plaintiff would have earned $3,720.00 ($930 × 4) at defendant; from October through December, plaintiff would have earned $2,850.00 ($950 × 3). Instead, plaintiff received $1,287.72 in severance pay and she earned a total of $5,149.38 from two employers in 1977. Hence, plaintiff is entitled to an award of $132.90, plus prejudgment interest at 8% per annum from December 31, 1977, for a total of $167.85.
In 1978, plaintiff would have earned $11,400.00 ($950 × 12) at defendant. Instead, plaintiff received $1,105.00 in unemployment benefits and earned $8,056.76 from two employers. Hence, plaintiff is entitled to an award of $2,238.24 plus prejudgment interest at 8% per annum from December 31, 1978, for a total of $2,617.41.
In 1979, plaintiff would have earned $11,400.00 ($950 × 12) at defendant. Instead, plaintiff earned $11,281.62 at two employers. Accordingly, plaintiff is entitled to an award of $118.38 plus prejudgment interest at 8% per annum from December 31, 1979, for a total of $128.18.
In 1980, plaintiff would have earned $11,400.00 ($950 × 12) at defendant. Instead, plaintiff earned $10,800.00 at her employer. Accordingly, plaintiff is entitled to an award of $600.00 for 1980, plus prejudgment interest at 8% per annum from December 31, 1980, for a total of $601.54.
The Court does not find that injunctive relief other than reinstatement is appropriate because the evidence did not show that as of the time of trial, defendant was engaging in practices discriminatory to women or practices that would be detrimental to plaintiff.[*]
*54 As to Count II, the Court finds that defendant must have judgment due to plaintiff's failure to give the required notice of intent to file suit within 180 days of her discharge as required by 29 U.S.C. § 626(d)(1). While this Court denied defendant's motion to dismiss Count II, which was made on that basis, this Court's ruling clearly indicated that it was based in part on the plaintiff's uncontroverted assertion that defendant had not posted any notice of plaintiff's rights under the ADEA, as is required by 26 U.S.C. § 627, and on plaintiff's uncontroverted assertion that she had no knowledge of her rights under the ADEA until she engaged an attorney in April, 1978. However, it was established at trial that defendant had in fact conspicuously posted the required notice against age discrimination, whether plaintiff saw the notice or not, and furthermore it was established at trial that the plaintiff received literature on age discrimination from the Department of Labor office which she visited on July 20, 1977, but that she did not read it. Under the circumstances, the Court finds that equitable tolling of the 180 days filing requirement is not appropriate. Nielsen v. Western Elec. Co., Inc., 603 F.2d 741 (8th Cir. 1979); cf. Bonham v. Dresser Industries, Inc., 569 F.2d 187 (3rd Cir. 1977), cert. denied, 439 U.S. 821, 99 S.Ct. 87, 58 L.Ed.2d 113 (1978); Kephart v. Institute of Gas Technology, 581 F.2d 1287 (7th Cir. 1978).
In accordance with the foregoing, judgment will be rendered for plaintiff on her claim of discriminatory discharge in Count I of the complaint and for defendant on the remainder of plaintiff's claims.

MEMORANDUM AND ORDER

On Motion For Reconsideration and Clarification
This matter is before the Court on plaintiff's motion for reconsideration and clarification of the judgment entered in this action on January 12, 1981, and on plaintiff's motion for an award of attorney's fees. In connection with the motion for reconsideration, the Court has taken additional evidence relating to changes in the salaries of Steven Krewson and the plaintiff in the interim between the trial of this matter and the entry of judgment.
The evidence showed that plaintiff's salary at Forms World, where plaintiff is still employed, increased to $950.00 per month as of June 1, 1980 and that it has remained at that level. Thus, plaintiff's total 1980 earnings at Forms World were $11,150.00 and plaintiff's total 1981 earnings through April 3, 1981 were $2,945.00. The evidence showed that Steven Krewson's monthly salary also increased, to $1,050.00 as of June 1, 1980, and that he also makes commissions on sales. Thus, had plaintiff remained in defendant's employ, she would have earned $12,100.00 in 1980; instead, she earned $11,150.00. Thus, plaintiff is entitled to an award of $950.00 for 1980, plus prejudgment interest at 8% per annum from December 31, 1980, for a total of $969.36. In 1981, as of April 3, plaintiff would have earned $3,255.00 in defendant's employ. Instead, plaintiff has earned $2,945.00 at Forms World in 1981; hence, plaintiff is entitled to an award of $310.00 for 1981. Plaintiff's back pay award and her salary upon reinstatement will be amended accordingly.
However, the Court declines to amend the back pay award in other respects. The evidence at trial as to plaintiff's health and hospitalization and disability insurance while in defendant's employ and since her discharge was too vague to permit recovery for plaintiff's expenditures for such insurance, because it did not establish the coverage of such insurance. Nor did the evidence at trial show that plaintiff's salary at Forms World includes an allotment for the purchase of insurance. The Court also declines to reconsider the deduction from plaintiff's award of unemployment compensation payments received by plaintiff.
Plaintiff is apparently requesting the Court to order that plaintiff be compensated for the decrease in value from 1976 to *55 1977 of 44 shares of stock in defendant owned by plaintiff. However, the loss in value of the stock is not attributable to defendant's discriminatory discharge of plaintiff, and the Court does not find that plaintiff need be compensated for that decrease in value. (Moreover, there was no showing as to the price at which plaintiff purchased the stock.) The Court finds that the "make whole" purpose of Title VII will be served in this regard by ordering defendant to offer to resell 44 shares of stock in defendant to the plaintiff at the price at which plaintiff was forced to sell her shares to defendant when she was discharged, i. e., $973.72. The Court will so order.
Turning to plaintiff's motion for an award of attorney's fees, the Court finds that plaintiff may be compensated for all the hours reasonably spent in connection with Count I of this matter, on which plaintiff substantially prevailed, pursuant to 42 U.S.C. § 2000e-5(k). Time devoted exclusively to Count II may not be allowed, because plaintiff did not prevail on that Count, although the Court takes cognizance of the "interrelated nature of [the] prevailing and non-prevailing claims," Brown v. Bathke, 588 F.2d 634, 637 n.5 (8th Cir. 1978).
The Court finds that the following hours must be deducted from the total for which plaintiff is to be compensated, because they are attributable solely to Count II: 3.75 hours for preparation of age charge; 2.50 hours for conference with the Labor Department; 10.50 hours for preparation of the response to defendant's motion to dismiss Count II; 3.00 hours in preparation of a response to defendant's motion to dismiss portions of Count II; 37.37 hours for half of the total hours devoted to preparing the pre-trial submission (which were somewhat excessive in any case); and 11.25 hours for half of the hours devoted to preparing the post-trial submission. In addition, the Court will deduct the 25.75 hours, spent on plaintiff's response to defendant's motion for separate trials, which was grossly excessive and which would have been unnecessary had Count II not been brought. The Court also finds that the expenditures of 9.00 hours on July 28; of 19.00 hours on September 14-15; and of 10.75 hours on October 4-9, were excessive for the respective purposes for which they were spent. Accordingly, they will be reduced by one-half. The above deductions leave a total of 256.01 hours. However, the Court finds that a further reduction of those hours, by fifth, is necessary to account for a certain percentage of time spent on discovery, interviews, conferences, and trial time, which, it may be assumed, was related solely to the age discrimination claim. The Court also finds that the $40.00 per hour rate charged by plaintiff's counsel is a reasonable rate.
Thus, the base figure from which adjustments may be made for the other factors cited in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974) is $8,192.40. After consideration of those other factors, the Court finds that further adjustment is not warranted. Plaintiff's request for interest on the amounts of the fees is denied, as is plaintiff's request for paralegals' fees.
In accordance with the foregoing,
IT IS HEREBY ORDERED that the Judgment entered January 12, 1981, in this action be and is amended in the following respects: plaintiff's reinstatement shall be at a salary of $1,050.00 per month, and plaintiff shall have the same opportunities for earning commissions as does Steven Krewson; and, the defendant shall pay the plaintiff Four Thousand, One Hundred and Ninety-Two Dollars and Eighty Cents ($4,192.80) rather than the sum of $3,514.98.
IT IS FURTHER ORDERED that, upon reinstatement of plaintiff, defendant shall offer to sell plaintiff 44 shares of its stock at a total price of $973.72.
IT IS FURTHER ORDERED that plaintiff's motion for an award of attorney's fees be and is GRANTED in the amount of Eight Thousand, One Hundred Ninety-Two Dollars and Forty Cents ($8,192.40).
NOTES
[*] The Court observes that Paul Edwards, at whose instigation the "reorganization" occurred, resigned from defendant in February, 1978.