750 A.2d 655

**Roy NERENBERG, Personal Representative of the Estate of Laura G. Nerenberg**

v.

**RICA OF SOUTHERN MARYLAND.**

No. 894, Sept. Term, 1999.

Court of Special Appeals of Maryland.

April 28, 2000.

648

650

Laura A. Stefani (Michael J. Kator and Kator, Scott & Parks, PLLC, on the brief), Washington, DC, for appellant.

Cynthia G. Peltzman, Asst. Atty. Gen. (J. Joseph Curran, Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and SALMON and THIEME, JJ.

THIEME, Judge.

This is an appeal from an order of the Circuit Court for Prince George's County granting summary judgment to the Regional Institute for Children and Adolescents (RICA) of Southern Maryland, a State operated facility for children with psychiatric and emotional disorders. Laura Nerenberg was hired by RICA as a therapeutic recreator. Because concerns arose about her job performance, management extended her initial six-month period of probation. Problems continued, and RICA management finally allowed Laura to choose between resigning from her job or being let go. Subsequently, Laura died of complications from insulin-dependent diabetes. Her estate sued RICA under the Americans With Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.* (1994), and the Rehabilitation Act, 29 U.S.C. § 794 (1994), after receiving a Probable Cause Determination and "right-to-sue" letter from the Equal Opportunity Employment Commission (EEOC). Laura's estate alleges that she was discharged solely because she suffered a disability. The court granted summary judgment in favor of RICA, and Laura's estate brings this appeal and asks:

1. Did the trial court err by granting RICA summary judgment when the estate failed to establish a *prima facie* case of discrimination under the ADA because it did not show that Laura met the legitimate expectations of her employer and that she was discharged because of her diabetes?

2. Did RICA produce evidence of Laura's poor job performance sufficient to overcome any presumption that she was discharged because of her diabetes and that its reasons were not pretextual?

3. Does a Probable Cause Determination by the EEOC preclude a grant of summary judgment to RICA when the estate did not present evidence sufficient for a reasonable jury to find that she was discharged because of her diabetes?

## Facts

The facts, set forth in the light most favorable to the appellant, who was the non-moving party at summary judgment, are as follows. Laura Nerenberg, a probationary employee of RICA of Southern Maryland, was given the choice of resignation or termination from her position as a Therapeutic Administrator I after her employer became increasingly dissatisfied with her job performance. After Laura died, at age 31, from complications of diabetes, her estate sued RICA under the ADA[1] and the Rehabilitation Act,[2] claiming that she was discharged because she was diabetic.

1. The ADA, 42 U.S.C. § 12112(a), states:

 No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

 The statute defines a *"qualified individual with a disability," i.e.,* a member of the protected class of persons, as

 an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

 § 12111(8).
 Disability is defined in the statute as follows:
 The term "disability" means, with respect to an individual—
 - (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
 - (B) a record of such an impairment; or
 - (C) being regarded as having such an impairment.

 § 12102(2).

2. The Rehabilitation Act, 29 U.S.C. § 794(a), states in relevant part:

 No otherwise qualified individual with a disability in the United States, as defined in section 706(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

RICA is a facility for children with psychiatric or emotional disorders recognized by the Diagnostic and Statistical Manual ("DSM") IV. Children placed at RICA may suffer from impulsivity disorders, severe disturbances in interpersonal relations and behavior, sexual identity problems, aggressiveness, and the aftereffects of physical and emotional abuse. These children are prone to behaving in ways that might result in harm; thus, they must be continually supervised by staff members who exercise sound judgment.

Monica Cooke, then the Director of Nursing and Residential Services, hired Laura in May 1994 for the position of Therapeutic Recreator I. Laura was responsible for supervising male children and adolescents, designing and implementing recreational activities used to evaluate their physical and emotional strengths, and evaluating whether they could engage in developmentally appropriate programs. She was also responsible for transporting them to off-campus events, and, we note, "state vehicles" were listed as required equipment on the position description form for a Therapeutic Recreator I. As with all new State employees, Laura was initially placed on probation for a six-month period.[3]

Cooke transferred to another facility in October 1994, and Janette Carson became the Acting Director of Nursing and Residential Services. Carson, who holds a master's degree

---

3. According to the affidavit of Frances Legg, the chief human resources officer at RICA, the six-month probationary period allows an employee's supervisor to determine whether that employee is able to fulfill all job duties and responsibilities. If the supervisor has any doubts about the employee's abilities to perform, the probationary period may be extended for an additional six months. If questions about the employee's performance continue to exist after the second six-month period, the supervisor is advised either to offer the employee the opportunity to resign or discharge the employee. It should be noted that the supervisor need not document the reasons for extending probation or notify the employee about problems prior to terminating the employment. The supervisor may, in fact, terminate the probationary employee without cause, and the employee may appeal that decision only if it was unlawful or unconstitutional. In contrast, a permanent State employee may be terminated only if the supervisor first employs progressive disciplinary measures, which must be fully documented.

with a specialty in psychiatric nursing, supervised all nurses and therapeutic recreators who provided care and services to the RICA children. She directly supervised Eddie Spearman, RICA's former Director of Therapeutic Recreation, who, in turn, supervised Laura.

Laura proved popular with the children, and she earned praises from Spearman. Because Spearman had considerable autonomy in running his department, Laura had relatively little contact with Carson and upper management. Nevertheless, even as Laura's probationary period was set to expire in November 1994, Carson harbored significant concerns about her job performance, and not without reason. For example, in October, while RICA children and staff participated in a tree-planting event, Laura allowed the children under her care to play near heavy equipment located in the vicinity. When Laura failed to heed Carson's warning to supervise the children more closely, Carson herself directed the children away from the equipment.

Thus, in late October, Carson met with Spearman to discuss Laura's job performance. At this meeting, Spearman also reported some concerns, but he said that he was willing to work with Laura to overcome them. He worried, for example, that Laura became overly involved with the children she supervised, jeopardizing the objectivity she needed to monitor and evaluate emotionally disturbed children. He was concerned that Laura became too invested in the unit's activities, *e.g.*, after a rock-climbing trip was canceled, she attempted to revive the activity, going from unit to unit trying to determine which children might still be available. He further noted that Laura inappropriately joined in activities outside of her unit, taking time away from her real responsibilities. Carson and Spearman met with Laura to discuss these concerns.

Carson decided, over Spearman's protests, that the concerns justified extending Laura's probation, and she thus contacted the personnel office to learn the appropriate procedures for doing so. She was informed that she only needed to complete a form to extend probation. She was not required to docu-

ment her reasons for the extension. Laura's probationary period was extended.

In December 1994, while transporting RICA clients in a State van, Laura suddenly became unresponsive. The mental health aide accompanying the group was unable to rouse her, and the van hit the car in front of it, which was stopped at a red light. Laura's loss of consciousness was never attributed to her diabetes; indeed, her own physician stated that her fainting spell or seizure was due to an unknown etiology, for her blood glucose level after the accident was within normal limits. It should be noted that, prior to the accident, neither Carson nor Dr. Joseph O'Leary, RICA's Acting Chief Executive Officer, seemed to know first-hand that Laura suffered from diabetes. Although Laura had indicated her condition on an employee information sheet, wore a medic alert bracelet, and had told some co-workers about the illness, Carson claims she had only heard rumors. Cooke, however, said that Dr. O'Leary seemed to know about Laura's medical condition and expressed concern about whether Laura's condition was sufficiently under control so that she could do her job.

After the accident, Carson, who questioned whether Laura was still able to perform the physical tasks that her job required, contacted Employer–Employee Relations, which recommended that Laura be referred to the State Medical Director's office for an evaluation. Such a referral is standard procedure for State employees who exhibit health problems on the job. The Medical Director requested that Carson prepare a task analysis of the Therapeutic Recreator I position, so that he might determine whether Laura could carry out her job duties. Carson included driving on the list of required tasks. Although the evaluation was incomplete at the time of Laura's termination, a neurologist had recommended that she should refrain from driving in the future, and all parties agreed.

As the probationary period continued, Carson and Dr. O'Leary identified additional problems with Laura's performance. For example, Laura seemed to have difficulty getting some of the more willful clients to cooperate with various

tasks. Laura also argued with Dr. O'Leary on one occasion, a problem that he considered to be especially serious in an institution that deals with severely disturbed children. The argument occurred in early February 1995, after he requested that Laura cease from trying to repair a broken copier. The machine had been damaged previously when other employees had tried to fix it, and Dr. O'Leary requested that she not remove a paper jam. Laura may have threatened to drive to the library to make copies. After Dr. O'Leary reminded her that she was not permitted to drive, she said that she would ask Spearman, her supervisor, to drive her there. Ultimately, Dr. O'Leary informed Laura that she was under his supervision and would have to respect his authority.

In January 1995, Laura experienced another episode of unconsciousness. She was supervising children in the gymnasium when she became unresponsive and fell down. Carson reported the incident to Employer–Employee Relations. Shortly thereafter, she received the Medical Director's report indicating that Laura was still under evaluation and should refrain from operating State vehicles.

On February 17, 1995, Carson received a complaint from the resident grievance counselor, an independent advocate for patients housed at State facilities, questioning the appropriateness of some of Laura's activities with the children. Such complaints, we note, are quite atypical, according to RICA management. Carson interviewed the children who had complained and learned that Laura tried to get the children—some of whom had suffered sexual abuse or experienced sexual identity problems—to participate in games in which they might risk touching one another's intimate parts. For example, Laura tied two boys together back to back, at the hip, and directed them to untie themselves, and she had the boys pass though one another's legs blindfolded. Carson thought the games were inappropriate for emotionally disturbed children and reported the matter to Dr. O'Leary, who agreed with her assessment.

Carson also learned from another staff member on the same day that Laura planned to take the children to see *Street Fighters*, a movie based on a video game that the children liked and described by the *Washington Post* reviewer as "ultra violent" and containing "ugly language." Both Carson and the unidentified staff member thought the movie was inappropriate for emotionally disturbed children.

Carson contacted Frances Legg in the Employer–Employee Relations Unit at RICA about these incidents. Legg had previously informed Dr. O'Leary that Laura's conduct at the copier alone warranted her termination, because she was a probationary employee and thus under evaluation for fitness to perform her job. Given these new complaints, she counseled Carson either to discharge Laura or give her an opportunity to resign. Legg had *no* knowledge that Laura suffered from diabetes. Later that day, Carson and O'Leary met with Laura and offered her a choice between resigning or being fired.[4] Laura initially chose termination, although she later submitted a letter of resignation.

### Discussion

■ This appeal arose because the trial court granted RICA's motion for summary judgment. We now seek to determine whether the trial court was legally correct, because, by granting a summary judgment motion, the trial court has ruled as a matter of law and refrained from resolving any disputed issues of fact. *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990); *accord, Barnett v. Sara Lee Corp.,* 97 Md.App. 140, 146, 627 A.2d 86, *cert. denied,* 332 Md. 702, 632 A.2d 1207 (1993). This Court must thus review the record and decide the same issues as the circuit court. *Nationwide Mut. Ins. Co. v. Scherr,* 101 Md. App. 690, 695, 647 A.2d 1297 (1994), *cert. denied,* 337 Md. 214, 652 A.2d 670 (1995).

---

4. Spearman, we note, was on scheduled leave when Laura resigned. Spearman expressed considerable dissatisfaction with the decision when he returned.

Summary judgment may be properly granted only where the movant " '(i) clearly demonstrate[s] the absence of any genuine issue of material fact, and (ii) demonstrate(s) that it is entitled to judgment as a matter of law.' " *Suburban Hosp., Inc. v. Health Resources,* 125 Md.App. 579, 588, 726 A.2d 807 (quoting *Fearnow v. Chesapeake & Pot. Tel. Co. of Md.,* 104 Md.App. 1, 48, 655 A.2d 1 (1995), *aff'd in part, rev'd in part,* 342 Md. 363, 676 A.2d 65 (1996)), *cert. granted,* 354 Md. 570, 731 A.2d 969 (1999); *see also,* Md. Rule 2–501(e). "A material fact is one that will 'somehow affect the outcome of the case.' " *Fearnow,* 104 Md.App. at 49, 655 A.2d 1 (quoting *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985)). A disputed fact only becomes significant and creates a genuine issue when it is material to the outcome of the case. *Keesling v. State,* 288 Md. 579, 420 A.2d 261 (1980).

To meet his burden, the movant must identify portions of the record that demonstrate absence of a genuine issue of material fact. *Fearnow,* 104 Md.App. at 49, 655 A.2d 1 (citing *Bond v. NIBCO, Inc.,* 96 Md.App. 127, 136, 623 A.2d 731 (1993)). Once the movant makes his showing, the burden shifts to the nonmoving party to "identify with particularity the material facts that are disputed." Md. Rule 2–501(b); *see also Fearnow,* 104 Md.App. at 49, 655 A.2d 1. "Neither general allegations of facts in dispute nor a mere scintilla of evidence will suffice to support the non-movant's position; there must be evidence upon which the jury could reasonably find for the moving party." *Id.* (citations omitted). "Thus, when a movant has carried its burden, the party opposing summary judgment 'must do more than simply show there is some metaphysical doubt as to the material facts.' " *Beatty v. Trailmaster Prod., Inc.,* 330 Md. 726, 738, 625 A.2d 1005 (1993) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

When considering a summary judgment motion, the trial court makes no findings of fact; instead, it decides whether a genuine issue that would preclude the entry of

summary judgment exists in the facts before it. *Suburban,* 125 Md.App. at 587, 726 A.2d 807. The court considers the motion and response submitted by the parties in the light most favorable to the non-moving party. *Fearnow,* 104 Md. App. at 49, 655 A.2d 1. It resolves all inferences from that evidence against the moving party, *Goodwich v. Sinai Hosp. Baltimore,* 343 Md. 185, 207, 680 A.2d 1067 (1996), and "the non-moving party is ... given the benefit of all reasonable doubts in determining whether a genuine issue exists." *Fearnow,* 104 Md.App. at 49–50, 655 A.2d 1.

▇▇▇▇▇▇ Here, the appellant-plaintiff seeks to show that the trial court erred in granting summary judgment to RICA, the appellee-defendant, in an employment discrimination case brought under two federal statutes, the ADA and the Rehabilitation Act. To prove discriminatory discharge under these statutes,[5] a plaintiff must first, in the absence of direct evidence, prove by a preponderance of the evidence the four prongs of a *prima facie* case set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). *See Ennis v. National Ass'n of Bus. &*

---

**5.** The estate sued RICA under both the ADA and the Rehabilitation Act. For brevity's sake, we will henceforth refer to those claims as being brought under the ADA, for ADA cases are "adjudicate[d] ... in a manner consistent with decisions interpreting the Rehabilitation Act." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 57 (4 th Cir.1995); *see also Myers v. Hose,* 50 F.3d 278, 281 (4 th Cir.1995) ("whether suit is filed against a federally-funded entity under the Rehabilitation Act or against a private employer under the ADA, the substantive standards for determining liability are the same").

We also note that federal cases provide substantive precedents here, because these are federal statutes, but Maryland's procedural rules apply. *See Goodwich,* 343 Md. at 205, 680 A.2d 1067 ("While it is well-settled that we must apply the substantive federal law governing a case such as this, it is equally well-settled that '[t]he law of the forum governs procedural matters.' ") (quoting *Rein v. Koons Ford,* 318 Md. 130, 147, 567 A.2d 101 (1989)). Federal holdings on summary judgment, however, do have precedential value in Maryland. *See Beatty,* 330 Md. at 736–38, 625 A.2d 1005 (1993); *Frush v. Brooks,* 204 Md. 315, 320–21, 104 A.2d 624 (1954) ("The Maryland summary judgment rules ... were taken from the Federal Rules of Practice and Procedure, Rule 56 ..., so that interpretations of the Federal Rules are especially persuasive as to the meaning of the Maryland rules.").

*Educ. Radio, Inc.,* 53 F.3d 55, 57–59 (4 th Cir.1995); *Brandon v. Molesworth,* 104 Md.App. 167, 655 A.2d 1292 (1995); *aff'd in part, rev'd in part,* 341 Md. 621, 672 A.2d 608 (1996). If the plaintiff succeeds, then the burden of production "shifts to the defendant to articulate some legitimate, non-discriminatory explanation which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 58. If the defendant meets this burden, the presumption created by the *prima facie* case disappears. *Halperin v. Abacus Tech. Corp.,* 128 F.3d 191, 197 (4 th Cir.1997). The plaintiff, however, has the ultimate burden of persuasion. *Id.* She must then show that the reasons put forth by the employer are merely pretextual and that her disability was the true reason for her discharge. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 508, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993).

Because, however, this appeal arises from a motion for summary judgment in which the defendant was the movant, we note that the estate bore no burden of proof. Instead, after RICA produced its evidence in support of summary judgment, it fell to Laura's estate, relying on the circumstantial evidence, to demonstrate that there existed a genuine issue by presenting, for *each* element of the *prima facie* case, facts that would be admissible in evidence. *Goodwich,* 343 Md. at 206, 680 A.2d 1067; *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10 th Cir.1997). It failed to present such facts. Even if it had established a *prima facie* case, the estate would have then been required to show that a genuine issue of material fact existed as to whether RICA's proffered reasons for Laura's discharge were pretextual, *id.,* which it also failed to do.

In its brief, the estate characterizes the instant appeal as one that revolves around the issue of RICA's intent, *i.e.,* whether it was motivated by legitimate business concerns when it fired Laura, or simply by the desire to rid itself of a handicapped employee. Cases that raise issues of intent, it argues, are inappropriate for summary judgment. *See Berkey*

*v. Delia,* 287 Md. 302, 307, 413 A.2d 170 (1980). Here, summary judgment *is* appropriate because there exists no genuine issue of material fact as to intent, *id.;* nevertheless, we also believe that appellant defines the issue too narrowly to encompass all considerations that the trial court would have made in granting summary judgment. We therefore apply the *McDonnell Douglas* framework to reach the ultimate question.[6] Our analysis of the issues faced by the trial court necessarily begins with whether the estate established a *prima facie* case of discrimination under the ADA.

I

We hold that RICA is entitled to summary judgment because the undisputed facts show that the estate would be unable to establish a *prima facie* case under the ADA. In *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824, the Supreme Court laid out the four prongs of the *prima facie* case under the Rehabilitation Act, which also apply to the ADA. The estate must prove:

> 1) that [Laura] was in a protected class; 2) she was discharged; 3) at the time of the discharge, she was performing her job at a level that met her employer's legitimate expectations; and 4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.

*Ennis,* 53 F.3d at 58 (citing *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981)) (applying *McDonnell Douglas*). The evidence adduced for the third and fourth prongs of *McDonnell Douglas* does not support an inference that RICA's employment decision was based on illegal discriminatory criteria, and, without that inference, the trial court would have been unable to find a genuine issue of material fact. *See O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 310–11,

---

**6.** Although the *McDonnell Douglas* framework "should not be applied in a 'rigid, mechanized, or ritualistic' manner," it is useful to help us organize the presentation of proof. *See Ennis,* 53 F.3d at 59.

116 S.Ct. 1307, 1310, 134 L.Ed.2d 433 (1996) ("As the very name 'prima facie case' suggests, there must be at least a logical connection between *each element* of the prima facie case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption.' ") (quoting *Burdine,* 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7) (emphasis added).

RICA does not dispute that Laura was discharged.[7] Neither does it dispute, for the purposes of this appeal, that Laura was in the protected class of persons.[8] Instead, it argues, and we agree, that the proof adduced by the estate did not present genuine issues of material fact as to whether Laura's job performance met the legitimate expectations of her employer and as to whether one might draw from the circumstances of her dismissal a reasonable inference that Laura was discharged because of diabetes.

### A

Even when the material facts are examined in the light most favorable to the estate, there is little doubt that Laura failed to meet her employer's legitimate job performance expectations. Laura was hired to work with emotionally and mentally disturbed adolescents, a job that required her to exercise good judgment and, when there was a policy disagreement, to yield to the seasoned perspective of those who supervised her,

---

7. Although Laura was offered the choice of resignation or termination, and she chose to resign, RICA acknowledges that such resignation had the *effect* of discharge and it does not dispute that Laura's estate met this element of the *prima facie* case.

8. RICA claims that the estate never established that Laura was a member of the protected class of persons, *i.e.,* that she was "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *See* § 12111(8). It notes that the trial court never reached this issue. In fact, the trial court refrained from deciding the estate's motion for summary judgment that requested a decision on whether Laura had suffered from a disability covered by the ADA. This motion was pending at the time the court granted summary judgment for RICA.

including Dr. O'Leary, a board-certified psychiatrist, and Carson, a registered nurse with a master's degree in psychiatric nursing.

In meeting its burden to show that the termination had been for legitimate reasons, RICA adduced considerable evidence that the estate does not contest to show that Laura's job performance had been problematic. For example, shortly after she became Director of Nursing in October 1994, Carson observed that the children in Laura's care at a tree-planting event were playing close to heavy equipment. Some of the children in Laura's group had problems with aggressiveness and impulse control, yet she allowed them to play with a heavy fire hose that could be used to hurt others. Ultimately, Carson intervened and removed the children from danger.

In November 1994, as Laura's probationary period was set to expire, Carson spoke with Spearman about Laura's performance. Both acknowledged that Laura had problems with becoming distracted by activities away from her unit and being overly involved with her charges in a way that risked her objectivity. Spearman said both at the time and during his deposition that he did not believe these concerns warranted extending Laura's probationary period, but Carson believed that they did. After discussing the matter with Employer–Employee Relations personnel, she completed the paperwork to do so.

Laura's performance problems continued during the extended probationary period. In February 1995, Carson learned of an incident in which Laura argued with Dr. O'Leary when he asked her to stop trying to remove jammed paper from the copier. Although details of the incident differ between witness accounts,[9] even the estate's witness agreed that Laura

---

9. In his deposition, Eddie Spearman stressed that Laura did not countermand Dr. O'Leary's order not to drive but, instead, told the doctor that she would ask Eddie to drive her to another copy machine. On the other hand, Deborah Hoppe, an administrator who overhead the argument, supports Dr. O'Leary's recollection that Laura told him of her plans to drive to another copier.

became quite upset with Dr. O'Leary. Employer–Employee Relations later advised Carson that this incident alone warranted dismissal.

Along with the other concerns that both Carson and Dr. O'Leary had about Laura's judgment, two other incidents that occurred on February 17, 1995, were determinative. First, Carson received the complaint from the boys under Laura's supervision. The boys, mainly adolescents, were uncomfortable with various trust-building exercises involving physical contact that Laura had chosen for them to do. In Dr. O'Leary's words, these exercises, although "intended to be therapeutic[,] were actually anything but in a population of emotionally disturbed, behaviorally disordered children, many of whom had a history of abuse, physical and sexual abuse, and neglect." Second, another staff member told Carson that Laura planned to take the children under her care to see an "ultra-violent" movie containing "ugly language." To Carson and Dr. O'Leary, this information provided more signs that Laura lacked the judgment to continue working at RICA. Carson spoke with a representative of Employer–Employee Relations, who advised that, based on her overall record, Laura should be terminated rather than permitted to become a permanent State employee. This procedure, we note, comports with Maryland's policies regarding the probationary period for new State employees, as explained in the affidavit of Frances Legg, Chief of the Employer–Employee Relations Unit at RICA. *See also DeJarnette v. Corning, Inc.*, 133 F.3d 293, 296 (4ᵗʰ Cir.1998) ("Corning watches its probationary employees closely and holds them to a higher standard than regular employees.").

The estate, we note, does not dispute that any of the aforementioned events occurred; rather, as the trial judge pointed out, only its *characterization* of those events and *interpretation* of what they mean differ from those of RICA. As for the estate's evidence that ostensibly creates genuine issues of material fact, it produced deposition testimony from Spearman and from Monica Cooke, Carson's predecessor, who served as Spearman's supervisor until October 1994. Both

Cooke and Spearman found no serious problems with Laura's performance at RICA. Cooke said in deposition:

> Q: Okay. And would you say that she possessed those qualities of a good recreational therapist that you just described to me?
>
> A: Absolutely....
>
> Q: Did you have any—ever observe any problems with her job performance?
>
> A: No, other than those related to her inexperience and seeking feedback, which I would consider normal, not problematic. In fact, advantageous that she would do that. No, I don't recall any specific problems.
>
> Q: Okay. Did you ever have the opportunity to evaluate her?
>
> A: Not in—not specifically, not formally, because [Spearman] would have done that, but I certainly would have given feedback to him about how to help her or manage situations, if she needed that....

Spearman said:

> I had no problem with her. The kids loved her. The staff loved her. I saw no reason for her to be on probation.... I'm her direct supervisor. Janet [*sic*] Carson or Joe O'Leary has no direct contact with her other than seeing her down the hallway.

Yet, even qualified praise for Laura's strengths and a different interpretation of the copier incident do not create issues of material fact as to her failure to perform up to the legitimate expectations of her employer. RICA does not claim that Laura was unqualified to be a therapeutic recreator or devoid of desirable traits as an employee. It discharged Laura not because the children or her immediate supervisor found her unpleasant, or even incompetent, but because she showed questionable judgment on several occasions. *Accord Clay v. City of Chicago Dep't of Health,* 143 F.3d 1092 (7th Cir.1998) (proof that plaintiff was once considered an adequate employee before her discharge does not suggest that defendants' explanation for her discharge was illegal). As for the

differences between the two accounts of the copier incident, we note the commonalities of material fact in both versions of the story. Neither party disputes the fact that Laura and Dr. O'Leary argued and that Laura became emotionally overwrought, appearing to be intemperate and defiant. The very fact that she argued with rather than immediately obeyed Dr. O'Leary is material; the precise words she used are not. Even examining this incident in the light most favorable to the estate, Laura clearly defied a direct order in an organization that by its nature must be a tight ship.

After she was terminated, Laura acknowledged to the EEOC that Carson and Dr. O'Leary informed her when they terminated her that their decision was based upon her poor judgment and tendency to argue. Given RICA's mission to serve emotionally and psychiatrically disturbed children and, in Dr. O'Leary's words, its "very high degree of obligation to the children that were served," we find it clear that Laura was unable to meet her employer's legitimate needs. While children and coworkers might have enjoyed Laura's company, RICA had a duty to protect its clients from negligent supervision, risky decisions, and staff members who tended to defy management. Because the estate cannot show that Laura met her employer's legitimate expectations, it failed to establish a *prima facie* case of discrimination under the ADA, and the court below properly granted summary judgment.

### B

Likewise, the evidence fails to support the fourth prong of the *McDonnell Douglas* test, for none of the facts adduced raises a reasonable inference that Laura was discharged because of her diabetes. The estate, as we note above, does not dispute the occurrence of the events leading up to Laura's being discharged. Instead, it focuses on "whether they were the true motivation for Laura's firing." RICA, in turn, concedes that Laura's coworkers, and possibly her managers, had "some incidental knowledge of her diabetes," but points out—correctly, we think—that "the mere fact that an employer

knows that an employee suffers from a disability is not evidence of discrimination."

The undisputed facts of Laura's termination contradict the estate's assertion that she was fired because of her illness. Carson and Dr. O'Leary made the decision to discontinue Laura's employment based on the advice of Frances Legg, Chief of the Employer–Employee Relations Unit at RICA. Legg states in her affidavit that she was unaware of Laura's diabetes at the time she initially advised termination, after the copier incident, and that, furthermore, such knowledge would not have changed the advice she gave about terminating employees with discipline problems:

> I advised Dr. O'Leary that he should terminate Ms. Nerenberg on probation because she exhibited behavior that was inappropriate. In general, if an employee on probation demonstrates any problematic behavior, I would recommend that the employee be terminated on probation or asked to resign. I further advised him that if he terminated Ms. Nerenberg on probation he would have to send her a notice outlining the reasons for the termination on probation and pay her for two additional weeks from the date she received notice of termination. *I did not know that Ms. Nerenberg had diabetes and in any event this would not have impacted on my advice at all.*

As for Carson's and Dr. O'Leary's knowledge of and supposed concerns about Laura's illness, we first note that her diabetes was no secret. Laura herself acknowledged the illness on her employee information form and wore a medic alert bracelet. Carson has testified that she had some "incidental" knowledge of rumors that marks on Laura's legs were somehow attributed to diabetes. Likewise, Monica Cooke testified that she could not remember Laura's diabetes "being an issue with anyone," and the only concern that Dr. O'Leary had expressed to her was whether Laura's diabetes was under control "and I guess . . . not going to black out when having a job to do with the kids." Testimony about the extent of their knowledge is consistent with the estate's claims that they

lacked day-to-day supervisory contact with Laura. Furthermore, it would be difficult to infer from the evidence anything other than concern for her safety and the smooth functioning of her unit at the center. Moreover, management's mere knowledge of Laura's diabetic condition is not enough to support an inference of discrimination. *Cf. DeJarnette,* 133 F.3d at 298 ("Rather than suggesting discrimination, Corning's knowledge of DeJarnette's pregnancy while hiring her creates an inference that Corning's reasons for discharging DeJarnette are not pretextual.").

Neither can the estate infer discriminatory intent from RICA's request that Laura be evaluated by a physician after the automobile accident in a State vehicle, which was caused by her loss of consciousness. The ADA does not bar such evaluations as long as they are "job related and consistent with business necessity."[10] *See Yin v. California,* 95 F.3d 864, 867–68 (9th Cir.1996) (employer can require physical evaluation to determine employee's ability to work); *Rodriguez v. Loctite Puerto Rico, Inc.,* 967 F.Supp. 653, 661 (D.P.R. 1997) ("Where a medical examination serves to determine an employee's ability to perform her job, the ADA would not prevent the plaintiff's employer from requesting the examination.").

Here, RICA did not seek to screen Laura to determine if she was disabled, an act that might have been contrary to law. Instead, management submitted the request for an assessment

---

**10.** *See* 42 U.S.C. § 12112(d)(4) (emphasis added), which states:

(A) Prohibited examinations and inquiries

A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be *job-related and consistent with business necessity.*

(B) Acceptable examinations and inquiries

A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. *A covered entity may make inquiries into the ability of an employee to perform job-related functions.*

to the State Medical Director *after* Laura had already caused an accident and endangered the clients riding with her, in order to learn "about any limitations that Ms. Nerenberg had," especially those that would put those clients at risk. At this point, not to have evaluated Laura's medical fitness would have been against State policies. As Legg stated in her affidavit,

12. I would advise a supervisor or personnel officer to send an employee for such an evaluation even if the employer agreed to accommodate the alleged condition. . . . This is to protect both the employee and the employer. The employee should be evaluated so that any additional limitation could be noted. This would prevent the employee from harming herself or himself as well as harming others. This would also protect the employer because the employer wants to minimize any injury to its employees, clients and third parties. . . .

19. I also learned that Ms. Nerenberg was going to be sent to the State Medical Director so that he could evaluate her ability to perform her duties and responsibilities. Because Ms. Nerenberg lost consciousness twice while she was working, and had an accident due to one such episode, such an evaluation was necessary. Ms. Nerenberg's voluntary agreement not to drive did not change the need for such an evaluation. It was incumbent upon the staff at RICA to learn about any and all limitations that Ms. Nerenberg had. The staff at RICA would be negligent in their duty if they failed to have such an evaluation performed. . . .

Without question, the medical evaluation ordered was job-related and consistent with the activities required of therapeutic recreators at RICA. Driving a State vehicle was in Laura's position description. Legg suggested the evaluation without any knowledge that Laura had diabetes; all she knew was that Laura had fainted and an accident had occurred.

Furthermore, no evidence adduced by either side suggests that the medical evaluation, which was never completed, led to any adverse job action. Quite the contrary occurred, in fact, because Carson stated both in deposition and in her affidavit

that she was willing to try to accommodate any disability that Laura had, whether or not it was caused by diabetes:[11]

Q: So the fact whether or not she could drive didn't have any impact on whether or not, in your mind, she could adequately do her job?

A: It did not during this time and during the time that she was under my supervision. It was easy to make other arrangements for people to drive, so until I had clearance from a physician, it was no problem.

In her affidavit, moreover, Carson stated that she "was concerned if Ms. Nerenberg had any other limitations *and they were not addressed*, it could result in harm occurring either to the children or to Ms. Nerenberg." Plainly, one could infer that RICA management was willing to work within Laura's limitations.

In contrast, the estate draws untenable inferences based upon the mere speculation of other RICA employees, including Monica Cooke and Eddie Spearman, both *former* employees who had disagreed with Dr. O'Leary. All Cooke's deposition contributed was information that Spearman and Leroy Hughes, her former assistant, passed on to her by phone after Laura's discharge.[12] Yet, Cooke could not recall *any* negative

---

**11.** Laura's own physician, Dr. Stuart Goodman, stated that "the etiology [of her seizures] was not entirely clear." Her blood glucose level, tested at the hospital after the accident, was normal.

**12.** Cooke testified that both Spearman and Leroy Hughes, a therapist, called her after Laura's discharge and speculated that discrimination had occurred:

Q: And who had told you?
A: People from RICA Southern that called after she left.
Q: Do you know their names?
A: Hearsay. Yeah. I've already said Leroy Hughes and Eddie Spearman....
Q: All right. What did Mr. Hughes tell you about Laura's termination as it related to her disability?
A: Well, he was concerned that she was terminated for her diabetes.
Q: Did he give you a reason why?
A: Well, I guess after the seizure van accident, he believed that Dr. O'Leary would get a little paranoid about that, to use his words, and

comments about Laura's diabetes made by Carson or Dr. O'Leary.[13] As for Spearman, his analysis of Laura's termination crumbled during his deposition. *See infra* Part III. In short, the evidence adduced presented little factual basis for the inferences that the estate wanted the trial court to draw.

Finally, the estate makes much of the timing of Laura's termination. It asserts that, because "RICA fired Laura just two months after the van accident, one month after the gym incident, and one week after she questioned the propriety of RICA's request for a medical evaluation," the timing of the dismissal "raises an inference of discrimination sufficient to survive summary judgment." *See Guadagno v. Wallack Ader Levithan Assoc.*, 950 F.Supp. 1258, 1264 (S.D.N.Y.1997) ("sequence of events" or "timing of the discharge" may raise some inference of discriminatory intent). We disagree. Taken alone, the timing of events identified by the estate might indeed raise an inference that discrimination had occurred. The mandate that we draw all inferences in the estate's favor, however, does not require us to remove from the timeline the other events that damage its case. When we view all the events together, including those that RICA claims affected the timing of Laura's termination, such as her argument with Dr. O'Leary and her poor choice of activities for the clients in her care, the evidence inexorably leads to the inference that she failed to display the attitude and judgment required to convert probationary employment to a permanent position.

In summary, the court might have *reasonably* inferred from the undisputed facts that when RICA management learned of Laura's diabetic condition it expressed concern for her well-being and proved its willingness to accommodate her medical condition as long as safety would not be compromised. *Beat-*

---

that Dr. O'Leary would be, you know, following up with Laura and watching Laura in terms of her medical condition.

**13.** For this reason, we think, the instant case does not fit the mold of the so-called "mixed-motive" cases like *Brandon v. Molesworth, supra,* upon which appellant relies. In mixed-motive cases, there exists *"some* discriminatory animus but also … independent, legitimate grounds for discharging the plaintiff." 104 Md.App. at 188, 655 A.2d 1292.

*ty,* 330 Md. at 739, 625 A.2d 1005 ("while a court must resolve all inferences in favor of the party opposing summary judgment, '[t]hose inferences ... must be *reasonable* ones' ") (quoting *Clea v. City of Baltimore,* 312 Md. 662, 678, 541 A.2d 1303 (1988)) (emphasis in original); *accord DeJarnette,* 133 F.3d at 298 ("To defeat an employer's motion for [judgment as a matter of law] as to liability in a discrimination suit, the plaintiff must present substantial evidence to support a reasonable probability, rather than a mere possibility, that her employer discriminated against her...."). The court below thus committed no error when it found an absence of genuine issues of material fact.

## II

 Even if the evidence showed that the estate could establish a *prima facie* case of discrimination, it would avoid summary judgment only if it could also create a genuine issue of material fact as to whether the non-discriminatory reasons for Laura's firing offered by RICA were pretextual and Laura was discharged because she was diabetic. *See Halperin,* 128 F.3d at 201 (citing *St. Mary's Honor Ctr.,* 509 U.S. at 515, 113 S.Ct. at 2752). RICA met its burden to show that legitimate problems with Laura's job performance warranted her discharge, especially given her status as a probationary employee who could be terminated at-will. *See supra* note 3. Because the estate could not create a genuine issue as to whether RICA's rationale for Laura's termination was mere pretext and the fact that she had diabetes played a role in RICA's decision to terminate her employment, summary judgment for RICA was appropriate.

 A discrimination plaintiff may show that the employer's stated legitimate and non-discriminatory reasons for termination are pretext for discrimination by proving " 'both that the reason was false, and that discrimination was the real reason for the challenged conduct.' " *Jiminez v. Mary Washington College,* 57 F.3d 369, 377 (4th Cir.), *cert. denied,* 516 U.S. 944, 116 S.Ct. 380, 133 L.Ed.2d 304 (1995) (quoting *St.*

*Mary's Honor Ctr.*, 509 U.S. at 515, 113 S.Ct. at 2751–52). Pretext might be established by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3 rd Cir.1994). For example, the plaintiff might show that non-disabled persons who performed their jobs in similar fashion were treated more favorably. *Johnson v. Jos. Schlitz Brewing Co.*, 581 F.Supp. 338, 347 (D.N.C.1984), *aff'd*, 765 F.2d 138 (4 th Cir.1985). Even then, if the plaintiff presents no evidence to assail the honesty of the employer's belief that its reasons are correct, the court cannot find those reasons to be discriminatory, even if it disagrees with the soundness of the employer's decision based on those reasons. *See Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 411 (7 th Cir.1997) ("it is not our province to decide whether that reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination"). A court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination." *Id.; see also Jiminez*, 57 F.3d at 377 (discrimination statutes are not "vehicle[s] for substituting the judgment of a court for that of the employer").

## A

The estate cannot establish that RICA's stated reasons for terminating Laura are false, because they are both plausible and consistent with events that both parties agreed had transpired. *See Fuentes*, 32 F.3d at 765. The estate does not dispute the fact that Carson reprimanded Laura for allowing her charges to play too close to heavy equipment at the tree-planting event. It concedes that Laura argued with Dr. O'Leary about her use of the copier. It does not dispute the fact that Laura directed her charges to participate in activities

that involved bodily contact or that she planned to take them to see a violent movie.

Even the estate's key witness, Eddie Spearman, never retracted his own concerns, albeit minor, about Laura's performance. Spearman differed with Carson and Dr. O'Leary over the extension of Laura's probation because he wanted to help her become a better employee, and he believed that the measure was unnecessary for attaining a useful performance appraisal. He stated that he "felt that Laura did what I asked her to do" and that Carson and O'Leary were unfamiliar with her day-to-day performance. He disagreed with their decision to discharge Laura over the events of February 17, because he believed it to be hasty—"If you don't know you're doing something wrong, how do you know it's wrong? You have to be told." Nevertheless, he did not disavow on the record the concerns he had expressed to Carson before she extended Laura's probation.[14]

Because the estate cannot claim that the events underlying Laura's dismissal did not occur, it seeks to create an issue of material fact by attacking, in conclusory fashion, the wisdom and fairness of discharging her. To do so, it advances the notion that because Laura (represented by her father) and her immediate supervisor Spearman do not believe that the problems articulated by RICA warranted her discharge, the reasons for her termination must be suspect. To quote the brief, the events leading up to Laura's termination are "hardly the stuff of which a legitimate firing decision is made." Without more, however, the estate cannot defeat summary judgment, for "mere general allegations which do not show facts in detail and with precision are insufficient to prevent summary judg-

---

14. Carson's deposition testimony outlines Eddie's concerns:

Q: What happened on [October] 28 th?
A: Well, Eddie and I met with Laura. . . . And Eddie outlined his concerns, and he outlined, as stated here, the three reasons for extending her probation.
Q: "Interaction with the residents, getting overinvolved on a particular activity, such as recent rockclimbing activity, and getting involved in activities in the unit when RT is not involved."

ment." *Beatty,* 330 Md. at 738, 625 A.2d 1005; *accord Morgan,* 108 F.3d at 1323 (citing *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10 th Cir.1988)).

Even the relatively specific testimony of its strongest witness fails to support the estate's much-needed inference that RICA's stated reasons were only pretext. In his deposition, Spearman repeatedly challenged management decisions that were based on standing policies for probationary employees *because he disagreed with management's implementation of human resources policy,* not because he believed those managers misrepresented that policy. For example,

Q: And did you participate in the decision to extend Laura's probation?

A: Yes and no.

Q: Tell me the yes part.

A: I participated in the fact that I was told. Did I agree? No, I didn't. . . . .

Q: All right. Well, what is your opinion as to why Laura was terminated?

A: I really don't know. I really don't know.

Q: You don't agree with the process, though?

A: I don't agree with the process and I don't agree with the fact that she was fired. My question is, in her personnel file, where is there anything in there that's detrimental to her from her supervisor? That's all I ask.

Spearman's belief that his own authority had been overridden in no way supports an inference of discrimination that would create a jury issue, especially in the absence of evidence that showed that Laura's diabetic condition played any role in management's decisions. As Chief Judge Wilkinson wrote in *Vaughan v. Metrahealth Cos.,* 145 F.3d 197, 202 (4 th Cir.1998):

*St. Mary's* ... teaches that to survive a motion for summary judgment under the *McDonnell Douglas* paradigm, the plaintiff must do more than raise a jury question about the veracity of an employer's proffered justification. The plaintiff must have developed some evidence on which a

juror could reasonably base a finding that discrimination motivated the challenged employment action.

The estate did not develop such evidence and, for that reason, the summary judgment for RICA must stand.

■ The law is clear, moreover, that opinions such as those expressed by Spearman are irrelevant. The *employer's* assessment and stated opinions about the discrimination plaintiff, and not the conflicting and often speculative opinions of the employee, her co-workers, or even her former supervisor, are relevant in determining the legitimacy of a termination decision.[15] *See DeJarnette*, 133 F.3d at 299. Such contrary opinions are insufficient to defeat a motion for summary judgment when the employer has established legitimate reasons for the employee's termination. In *DeJarnette*, for example, the Fourth Circuit upheld a grant of summary judgment to an employer, even when the employee, who was still in her probationary period, presented testimony of her co-workers that she performed her job adequately. Indeed, the court found such opinion testimony to be irrelevant:

> With respect to opinion testimony, we have repeatedly explained that "it is the perception of the decision maker which is relevant," not the self-assessment of the 'plaintiff. . . . Similarly, that plaintiff's co-workers may have thought that she did a good job, or that she did not deserve to be discharged, is close to irrelevant.

---

**15.** To the contrary, opinion evidence may be relevant when establishing whether the employer's belief about termination is honestly held. *See Giannopoulos*, 109 F.3d at 411; *accord: Williams v. Williams Elecs. Inc.*, 856 F.2d 920, 924 (7th Cir.1988) ("Initially, Rosie Williams' own self-interested assertions concerning her abilities are not in themselves sufficient to raise a genuine issue of material fact. The addition of former supervisor Griffin's affidavit does not significantly alter the situation. His general assertions concerning Rosie Williams' abilities, which did not explicitly weigh her abilities against those of the retained technicians, do not create a basis upon which it can be concluded that Williams Electronics did not genuinely and honestly weigh performance-based considerations in making its layoff decision.") (citations omitted).

*Id.* (citations omitted); *accord Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir.1998); *see also Anderson v. Baxter Healthcare Corp.,* 13 F.3d 1120, 1124 (7th Cir.1996) ("The mere submission of materials from a co-worker or supervisor indicating that an employee's performance is satisfactory ... does not create a material issue of fact."); *Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446 (7th Cir.1994) (opinions of co-workers "[do] not shed any light on whether the employer honestly based its employment decision on performance-related considerations, which is the focus of our inquiry in these cases").

Here, the employer's rationale for terminating Laura was well articulated in the evidence and based upon legitimate and non-discriminatory business requirements. First, Laura was terminated while she was still in her probationary period, which Carson, a new supervisor, had extended for the purpose of determining her fitness for continued employment.[16] According to Legg, the chief human resources officer at RICA, extending Laura's probation was well within Carson's authority. A probationary employee, in her words, "can be terminated for no reason or any reason at all as long as the reason is not an illegal or unconstitutional one." Legg also points out that probationary employees are "generally not subject to ... progressive discipline" and his or her "supervisor has no obligation to document a new probationary employee's improper behavior or inform the employee about such behavior prior to terminat[ion]." Second, RICA's legitimate business needs require that staff exercise good judgment and respect the

---

**16.** At deposition, Carson explained:

Q: How long had you been in the job as a second-level supervisor before you made the decision to extend her probation?

A: I believe her probation was up. I think that we had to—I know that the state has certain rules about acting within a certain time period before the probation period ends, and it was really very soon after I was appointed to the acting position that her probation—that I was advised by the personnel department at RICA that her probation period was up and that it—a decision needed to be made about her probation.

Q: So it was shortly after you took over?

A: Yes.

chain of command. RICA's clients are "a fragile population of adolescent children in a strictly controlled environment," according to Dr. O'Leary. For staff members to use poor judgment in selecting and managing activities or ignore the guidance of more experienced managers could create unnecessary risks for children who are already in trouble.

In summary, the estate cannot prove that the underlying facts disprove the reasons given by RICA for Laura's discharge. Its evidence, instead, is limited to the opinions of those former co-workers and supervisors who have philosophical differences with RICA's management practices. Yet, the opinion that counts, as a matter of law, is that of RICA, and we hold that the trial court did not err by granting summary judgment for that agency.

## B

Just as the estate's opinion evidence does not bring to light any material contradiction between the facts of Laura's termination and RICA's reasons for the same, it also does not prove that those reasons were mere pretext that camouflaged discriminatory firing. To avoid summary judgment, the estate's evidence must do more than create an issue about the veracity of RICA's justification. It must also create a genuine issue of material fact as to whether discrimination was the "real reason" behind Laura's termination. *See St. Mary's Honor Ctr.*, 509 U.S. at 524, 113 S.Ct. at 2756 (outlining the "pretext-plus" standard); *Gillins v. Berkeley Elec. Coop., Inc.*, 148 F.3d 413, 417 (4th Cir.1998) ("Under *Vaughan* [*v. Metrahealth Cos., Inc.*, 145 F.3d at 201–02], Gillins must make a two-pronged showing in order to survive BEC's motion for summary judgment: he must adduce sufficient evidence both that the proffered, nondiscriminatory reason is false and that race discrimination is the "real reason" for his temporary demotion."). In *Hallquist v. Local 276*, 843 F.2d 18, 24–25 (1st Cir.1988), for example, the employer claimed that the employee was let go as part of corporate downsizing. Because the employee was able to prove that the employer's workforce actually grew over the relevant period, she recovered. *See*

*also EEOC v. Gaddis,* 733 F.2d 1373, 1378–79 (10th Cir.1984) (terminated African–American worker recovered against employer who claimed he was "accidentally hired" to fill a vacancy by showing that two white workers were subsequently hired for same position); *Smith v. Flesh Co.,* 512 F.Supp. 46, 52 (E.D.Mo.1981) (female employee recovered by showing that company reorganization that putatively led to her termination existed for the purpose of firing all women in order to hire men).

◼ Here, the estate does not establish any "real reasons" other than those offered by RICA. Its "evidence" consists of statements of Laura's former supervisors opining that the incidents identified by RICA—the occurrence of which the estate does not deny—provided insufficient justification for discharge. As the trial court noted, the estate's "spin" is *not* evidence:

> What is the reason for me to disbelieve Dr. O'Leary when the incidents that he cites for the termination are not disputed, that they occurred. What is disputed is how you interpreted them or how you characterize them.

"[W]hen an employer articulates a reason for discharging the plaintiff not forbidden by law, it is not [the court's] province to decide whether the reason was wise, fair, or even correct, ultimately so long as it was truly the reason for the plaintiff's termination." *Giannopoulos,* 109 F.3d 406, 411 (7th Cir.1997); *see also DeJarnette,* 133 F.3d at 299. Lacking any evidence of "real" underlying reasons or any shadow of pretext, the court properly granted summary judgment.

The estate insists that the court below erred in granting summary judgment, because this case, in its view, revolves around RICA's "state of mind," *i.e.,* its actual motives for discharge. It argues, quoting *Brandon v. Molesworth,* 104 Md.App. at 167, 655 A.2d 1292, that cases like this one must *always* go to the jury even if there is a *possibility* that the employer's motive for discharging an employee is pretextual:

> As a general proposition, the resolution of conflicting inferences as to state of mind is within the province of the jury. It was the function of the jury, as fact-finder, to evaluate the

testimony of the witnesses; the jury was entitled to believe all, some, or none of the testimony of the various witnesses.

*Id.* at 197, 655 A.2d 1292 (citations omitted).

The estate, however, oversimplifies the law. Other authority provides a more complete statement of the law:

> Although it is often more difficult for the moving party to prevail on a summary judgment motion where state of mind is at issue, it is certainly not impossible. In *Goldberg v. B. Green & Co.*, 836 F.2d 845, 847 (4th Cir.1988), this court upheld summary judgment where the plaintiff failed to produce any evidence that the defendant had used age discrimination as a motivation for terminating the plaintiff's employment. *The court noted that although motivation was at issue, the plaintiff's "naked opinion, without more, is not enough to establish a prima facie case of age discrimination."*

*Yarnevic v. Brink's Inc.*, 102 F.3d 753, 757 (4th Cir.1996) (citations omitted) (emphasis added); *see also DeJarnette*, 133 F.3d at 298 (judgment for defendant was appropriate where probationary employee challenged employer's motive for discharge, because " 'it hardly makes sense to hire workers from a group one dislikes ... only to fire them once they are on the job' ") (quoting *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir. 1991) (quotations, citations, and alteration omitted)). Here, the estate's evidence is nothing more than naked opinion, its attempt to change the meaning of events surrounding Laura's termination without identifying any new facts that would change the picture. To avoid summary judgment, however, would have required the estate to "produce direct evidence of a stated purpose to discriminate *and/or* circumstantial evidence of sufficient probative force to reflect a genuine issue of material fact." *Goldberg*, 836 F.2d at 848 (emphasis added); *accord Brandon*, 104 Md.App. at 187 n. 18, 655 A.2d 1292 ("The *McDonnell Douglas* proof scheme is an alternative to the presentation of direct evidence."). It cannot provide such evidence, and thus summary judgment is proper.

Finally, we note that the instant case is distinguishable from *St. Mary's Honor Ctr.*, upon which the estate strongly

relies. Unlike the employee in *St. Mary's,* who established a *prima facie* case, 509 U.S. at 506, 113 S.Ct. at 2747, Laura's estate failed at the outset to establish such a case and, further, it failed to present any evidence from which a reasonable jury could conclude that her diabetes played any role in the decision to terminate her employment. Instead, it merely speculates—ignoring, we note, Maryland's policies for new employee probationary periods—that Laura must have been discharged for her diabetic condition because the incidents cited by RICA were not serious enough to warrant that result. Mere speculation falls short of showing how the evidence creates a genuine issue of material fact that would defeat summary judgment. In the absence of such an issue, the court properly granted summary judgment to RICA.

## III

Finally, Laura's estate argues that the EEOC's Probable Cause Determination alone defeats the trial court's grant of summary judgment to RICA. We disagree. Were appellant correct, every case for which the EEOC issues a probable cause determination would, by definition, go to a jury. Actual case law does not bear this out.

As we see it, the Probable Cause Determination merely creates a colorable issue for litigation. It resembles the due diligence that any conscientious attorney would perform prior to filing a complaint. For the plaintiff, it is a hedge against a motion to dismiss; for the defendant, it is a hedge against a frivolous claim. The discovery phase, on the other hand, is the litigants' opportunity to flesh out their issues and bring to light, if they exist, genuine factual disputes.

Even when the EEOC finds probable cause and issues a right-to-sue letter, summary judgment may be appropriate. *See, e.g., Goldberg,* 836 F.2d at 848, and *Baumgardner v. Inco Alloys Int'l, Inc.,* 746 F.Supp. 623, 625 (S.D.W.Va. 1990). In both these cases, the EEOC Probable Cause Determination was based on the employee's bare allegations of age discrimination, and yet, because no actual proof sufficient to

support a jury verdict was forthcoming, the trial court correctly granted summary judgment.[17] " '[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted'." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4 th Cir.1987) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted)).

Here, the estate has presented no evidence that Laura was discharged from RICA because of her diabetes other than the fact that she had experienced two fainting spells of "unknown etiology" while on the job; her immediate supervisor disagreed with a managerial decision to terminate Laura, even in the face of performance problems that had been previously discussed and documented; and a fellow employee speculated that Laura had been terminated because of her illness. *See supra* note 12. The latter two prongs of the estate's evidence for the EEOC are, in fact, bare allegations based on Laura's opinion of her termination. Whereas such bare allegations might be enough to arouse the suspicions of EEOC investigators, they are insufficient to support a jury verdict. *Id.* We note, moreover, that statements made to the investigators by the estate's strongest witness, Spearman, wilted in the heat of questioning by RICA's counsel during his deposition.[18] To the EEOC investigator, Spearman asserted,

---

**17.** In its reply brief, the estate cites *Gifford v. Atchison, Topeka & S.F.R. Co.*, 685 F.2d 1149 (9 th Cir.1981), for the proposition that an EEOC Probable Cause Determination creates a jury issue. As we read this case, we note that the actual thrust of the Ninth Circuit's holding was that plaintiff had "an absolute right to introduce the EEOC's reasonable cause determination into evidence" and that the EEOC had conducted an impartial investigation. *Id.* at 1156 & n. 4. These points we do not dispute. Although the Ninth Circuit found that a jury issue existed in *that particular case,* the case in no way implies that EEOC Probable Cause Determinations should be so used across-the-board.

**18.** We note here that, standing alone, conflicting statements from the same witness are insufficient to create a genuine issue of material fact. *See Halperin,* 128 F.3d at 198.

I feel Laura was terminated because of her disability. Jan made it clear that she had a problem with her disability. I can think of no other reason she was terminated especially since she received no disciplinary actions.

At deposition, Spearman recanted:

A: And then I came in the next day and there's a note in my box, oh, we had to fire Laura and we'll talk to you about it on Monday. . . .

Q: Did you talk to Ms. Carson about that?

A: Yes, that Monday.

Q: And what did she tell you?

A: Nothing. There was [*sic*] some glowing [*sic*] problems and they had to do what they had to do. It was a quick thing. . . .

Q: Did you ever talk to Dr. O'Leary about this?

A: No.

Q: All right. *Well, what is your opinion as to why Laura was terminated?*

A: *I really don't know. I really don't know.*

Q: You don't agree with the process, though?

A: I don't agree with the process and I don't agree with the fact that she was fired. . . .

Q: There's a sentence here [in the EEOC affidavit] that says, Jan made it clear that she had a problem with her disability. *Can you tell me what Jan said that made it clear that she had a problem with Laura's—*

A: *No, I can't tell you what she said, because it wasn't what she said. It was how she—the feeling I got in the room.*

Q: The feeling you got in the room?

A: The feeling I got in the room.

Q: Was?

A: *That Jan had a problem with her driving the van, which was because of the diabetes.*

Q: Did she have a problem with—did you get a feeling she had a problem with anything else in Laura's job?

A: No.

Q: Because of the diabetes or just driving the van.

A: *Just driving the van* ....

▮ Bare and unsubstantiated allegations, especially those that dissolve under scrutiny, are not enough to defeat a motion for summary judgment. These bare allegations, combined with the estate's failure to establish a *prima facie* case of discrimination, RICA's significant proof of legitimate reasons for Laura's discharge, and the dearth of evidence showing that these reasons were false or pretextual, make clear to us that the trial court correctly granted summary judgment to RICA in this matter. We thus affirm.

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**