868 A.2d 925

**James HELLER**

v.

**DEPARTMENT OF NATURAL RESOURCES.**

**No. 68, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Feb. 24, 2005.

302

Robin R. Cockey, Salisbury, for Appellant.

Paul J. Cucuzzella (Rachel Eisenhauer, J. Joseph Curran, Jr., Atty. Gen., on the brief), Annapolis, for Appellee.

Panel: HOLLANDER, ADKINS and MEREDITH, JJ.

ADKINS, Judge.

At the center of this employment dispute is Md.Code (1973, 2000 Repl.Vol., 2004 Cum.Supp.), section 5–908.1 of the Natural Resources Article (NR), which creates

a Somers Cove Marina Improvement Fund in the Department [of Natural Resources], **to be used for the operation, maintenance, development, and improvement of the Somers Cove marina facilities in Crisfield, Maryland. Any money obtained by the Department from Somers Cove Marina shall be credited to the Somers Cove Marina Improvement Fund.** (Emphasis added.)

Appellant James Heller sued the Department of Natural Resources (DNR), appellee, under the "Whistle Blower Law," *codified at* Md.Code (1993, 2004 Repl.Vol.), § 5–305 of the State Personnel and Pensions Article (SPP). He alleges that he was transferred and demoted from his position as the Somers Cove Marina manager because he complained that marina revenue was not being properly credited to this fund and that funds earmarked for the marina were being used improperly for the benefit of other DNR divisions.[1]

---

1. Effective October 1, 2004, after the proceedings giving rise to this appeal, NR section 5–908.1 was amended to read:

 (a) In this section, "Fund" means the Somers Cove Marina Improvement Fund.

We shall hold that Heller made a protected disclosure within the purview of the Whistle Blower Law. We also conclude that Heller must be afforded an opportunity to present evidence in support of his claim that DNR removed him as marina manager in order to silence his persistent challenges to what he considered to be improper and illegal DNR fiscal practices, while citing a contrived sexual harassment complaint by a co-worker as pretext for that reprisal. We shall remand for further administrative proceedings on Heller's Whistle Blower claim.

## FACTS AND LEGAL PROCEEDINGS

### Challenges To DNR's Fiscal Practices

From October 1998 until April 2001, James Heller worked for DNR as the manager of Somers Cove Marina (SCM) in Crisfield. When he was hired, Heller was instructed to find out "why the marina was running a $197,000 deficit" and to "make the [m]arina profitable." From the outset of his tenure, Heller's review of DNR's data, accounting, budgeting, and spending practices revealed what he believed were fiscal improprieties that included violations of NR section 5–908.1. Specifically, after talking with his predecessor and reviewing DNR's monthly "green sheets" showing receipts and ex-

---

(b) There is a Somers Cove Marina Improvement Fund in the Department, to be used for the operation, maintenance, development, and improvement of the Somers Cove Marina facilities in Crisfield, Maryland.

(c) Any money obtained by the Department from Somers Cove Marina shall be credited to the Fund.

(d)(1) The Fund is a special, nonlapsing fund that is not subject to § 7–302 of the State Finance and Procurement Article.

(2) Any investment earnings of the Fund may not be transferred or revert to the General Fund of the State, but shall remain in the Fund.

(3) Moneys in the Fund may be used for administrative costs calculated in accordance with § 1-103(b)(2) of this article.

See 2004 Md. Laws, ch. 472 & ch. 550. This was one of several amendments made "for the purpose of . . . specifying and clarifying the purposes of, accounting procedures for, financing for, authorized uses of, and investment and disbursement standards for certain special funds and accounts administered by the Department[.]" See 2004 Md. Laws, ch. 550.

penses, Heller suspected that there were three related problems contributing to SCM's financial shortfall.

First, Heller concluded that revenue generated by the marina (called "attainment") was not being timely credited to the Fund as required by NR section 5–908.1. In turn, because the marina's operating budget was predicated on attainment figures in a previous fiscal year, the marina's budget was set far below what it should have been and what was reasonably necessary to operate the marina. Among the problems Heller initially pointed to was that $80,000 in marina revenue had not been credited to the SCM Fund. When Heller brought this to the attention of three successive DNR supervisors and DNR budgeting officials, they pointed to prior management's failure to submit requisite paperwork as the explanation for the discrepancy between the revenue taken in at the marina and the revenue reported in the budgeting process. The alleged lack of paperwork resulted in credit card revenue being held in escrow, which in turn resulted in the exclusion of that attainment from the year-end figures used to create SCM's budget.

Second, Heller asserted, funds that had been appropriated for the marina were being diverted to other uses, also in violation of section 5–908.1. Among the expenses Heller initially brought to the attention of his DNR superiors were that $40,000 from the SCM Fund had been paid for operations at the Great Hope Golf Course in Somerset County, that a $24,000 truck supposedly purchased for SCM was being used by DNR Regional Director Joseph Ward at Jane's Island State Park, and that other Fund moneys had been used for various projects and personnel outside SCM. DNR officials told Heller that there was a three-year contractual arrangement for the marina to purchase golf course passes for resale at the marina, but that few or none of the purchased passes had been resold. They also took the position that the truck, as well as SCM funds, could be transferred and used for the benefit of other DNR facilities and personnel.

Third, Heller complained that funds appropriated for SCM were being set aside ("encumbered") for non-marina purchases and personnel, or for other purposes that were not included in the marina's budget, in violation of section 5–908.1. As a result, money budgeted for the marina was not being spent on the marina. Again, DNR officials explained to Heller that they considered some such encumbrances permissible.

Heller concluded that DNR had a policy and routine practice of using SCM as a "cash cow" to fund DNR facilities, equipment, and personnel, outside SCM. From the outset, he expressed his strong belief that any diversion of SCM's attainment; any use of the SCM Fund or money appropriated for SCM; and any encumbrances on SCM's budget for purposes other than SCM facilities, programs, and personnel violated NR section 5–908.1. Heller objected that these practices caused the marina to be "shorted" in the amount budgeted, the amount credited, and the amount actually spent for the benefit of the marina. He maintained that these were improper and illegal fiscal practices that lay at the root of deficits, inadequate budgets, marina price increases, and ultimately, diminished service to marina customers and the public.

In 1998 and early 1999, Heller brought his observations and objections to the attention of Joseph Ward, his immediate DNR supervisor who also had direct management responsibility for Jane's Island State Park, and Daryl DeCesare, DNR's Regional Manager for the Eastern Shore division of the State Parks and Forest Service (SPFS). Both rejected Heller's concerns that these practices violated section 5–908.1, for the reasons summarized above.

Despite his supervisors' explanations and assurances, Heller continued to complain about what he viewed as ongoing misuse of revenue generated by the marina and funds appropriated for the marina. Heller's concerns eventually became a matter of public discussion. One letter dated September 14, 2000, from a long term marina user to then-Governor Parris Glendening states that he had "been informed that some of

the money collected for the [m]arina has been siphoned into areas other than the Somers Cove Improvement Fund as outlined in Article 5–908.1" and "ask[s] the Attorney General Office to investigate this matter." A November 2, 2000 letter from another marina user to DNR's Assistant Superintendent for the SFPS inquires about the "actual amounts credited to the Somers Cove Improvement Fund" and the "yearly expenditures from the Somers Cove Improvement Fund ... attributable to the intended purpose of the fund as directed by Comar [sic] 5–908.1[.]" These and follow up letters were shared with "slipholders of Somers Cove Marina" as well as DNR managers, including Ward, DeCesare, and SFPS Superintendent Barton. In addition, copies were sent to political representatives, including U.S. Senator Barbara Mikulski, State Senator Lowell Stoltzfus, and State Delegate Charles McClenahan.

By early 2001, the General Assembly had begun to audit DNR to determine, *inter alia*, whether the agency had corrected fiscal practices that had been disapproved in a 1999 audit report. Among the previously disapproved practices was DNR's use of legislatively earmarked funds for non-earmarked purposes, though no specific funds were identified in that report.

Ward and DeCesare responded repeatedly to Heller's concerns and complaints, rejecting each one and attempting to focus Heller on staying within the marina's budget, regardless of its acknowledged flaws. But Heller remained unsatisfied and continued to object to what he viewed as the continuing misuse of marina revenue and appropriations. According to Heller, unable to silence him, Ward, DeCesare, and other senior DNR managers created an opportunity to remove him from his post at the marina. Heller alleges that, as pretextual justification for a retaliatory transfer and demotion to a "gopher" position at a nearby park, DNR "cooked up" a harassment complaint by his disgruntled assistant, who was then rewarded for her role.

## The EEO Claim

Mary Taylor began working at the marina as office manager in January 1999. Although Taylor and Heller initially had a good working relationship, by the summer of 2000, Heller was dissatisfied with her performance. From Heller's perspective, Taylor became difficult after he began a personal relationship with Becky Lowe, an area resident who did some contract work for the marina.

In July 2000, after consulting with Ward and DeCesare, Heller attempted to reprimand Taylor for various job performance deficiencies. Among the workplace problems, he felt, were inappropriate attempts to "romanticize" their strictly professional relationship. This session did not go well, ending with an upset Taylor leaving the marina. According to Heller, Taylor threatened to resign and he invited her to do so. According to Taylor, Heller demanded that she resign.

Taylor immediately contacted Ward and DeCesare, who intervened in the dispute. Taylor returned to work, with Ward and DeCesare assuming some of the supervisory responsibilities over her that Heller previously held. Tension between Heller and Taylor continued.

In August 2000, Lowe lodged a complaint against Taylor, alleging that Taylor steered Lowe's customers away from her. The complaint was investigated; in early 2001, it was determined to be "unfounded."

Meanwhile, both Heller and Taylor continued to complain to Ward about the "hostile work environment" that each thought the other was creating. Heller went so far as to send an August 26, 2000 memo notifying Ward and DeCesare that Taylor appeared to be taking steps to "set up" the DNR for a "hostile environment" lawsuit.

On April 11, 2001, Taylor followed up her oral conversations with Ward with a letter "to substantiate our conversation on May 9, 2001[sic] regarding my concerns at Somers Cove Marina." Taylor stated that she felt "very uncomfortable working at Somers Cove Marina alone with Mr. Heller"

because, "under the circumstances of the previous investigation brought about by Mr. Heller's significant other, Ms. Becky Lowe, . . . I am quite concerned of future persecution from either Mr. Heller or Ms. Lowe." Asserting that "[w]orking alone with Mr. Heller makes [such persecution] inevitable[,]" Taylor claimed that "[t]he accusations from the investigation show that both individuals mentioned have misconceptions of my intentions as an employee of Somers Cove and in my opinion [border] on sexual harassment." She pointed out that, "[i]f the accusations were true, I would think that Mr. Heller would be writing this letter to you to avoid working alone with me. Instead, I am pleading for your immediate attention to my working conditions."

By memo dated April 13, DeCesare responded to Taylor's letter by ordering Ward to "assume direct management of the marina" while "investigations are conducted[.]" The following day, Ward met with Heller to advise him of Taylor's charges and to reassign him to a lesser position at Pocomoke River State Park, while Taylor remained at her marina post. According to Heller, Ward told him that he, rather than Taylor, was being removed from the marina "[b]ecause you're the one the charges were made against."

Denying Taylor's charges, Heller maintained that Taylor's complaint was encouraged by Ward and DeCesare in an effort to create a pretext for removing him as marina manager, in order to silence his complaints about the misuse of marina funds. In support, Heller contends, *inter alia*, that, as an immediate result of his transfer and demotion, Taylor received an unusual five grade promotion and raise, retroactive for one year.

## Probable Cause Determination

In a written decision dated May 30, 2001, DNR's Equal Opportunity Employment Officer found "sufficient information and evidence against [Heller] to support a *'Finding of Probable Cause,'* in that [Heller] did discriminate against [Mary Taylor] based on her gender." On June 21, SFPS Superintendent Col. Rick Barton issued a written reprimand to Heller

based on that investigation and finding. He made permanent the transfer to Pocomoke, demoted Heller's employment grade, mandated that he submit to sexual harassment training, and barred him from having any contact with Taylor and from visiting Somers Cove Marina.

Through counsel, Heller appealed the decision to DNR Secretary Sarah Taylor–Rogers on both substantive and procedural grounds. In a letter dated June 29, 2001, counsel asserted that "the disciplinary action undertaken against [Heller] was prompted by a disclosure of managerial and fiscal misconduct[.]" When the DNR Secretary found the action "appropriate" given "the seriousness of the findings of probable cause of sex discrimination," Heller again appealed, while reserving his right to assert a Whistle Blower claim.

On August 22, 2001, Heller asserted a Whistle Blower claim to the Secretary of the Department of Management and Budget. The Director of Audit and Management Review investigated and found no merit to the claim. His report reviews only Heller's early complaints about the Great Hope Golf Course, the pickup truck, and DNR's delay in crediting all SCM receipts, and rejects each one as the result of Heller's misunderstanding of DNR's budget and financial practices. On February 12, 2002, Heller appealed the decision, asking for an administrative hearing before an administrative law judge appointed by the Office of Administrative Hearings.

A March 26, 2002 settlement thereafter resulted in the DNR removing the written reprimand from Heller's record and upgrading his position at Pocomoke. Per agreement that "this Settlement Agreement does not affect any claims or defenses by either party in the Petitioner's Whistleblower action appealed to the Office of Administrative Hearings on February 12, 2002," Heller was free to pursue his claim under Maryland's Whistle Blower Law. DNR acknowledged that "nothing in this Agreement shall prejudice [Heller's] Whistle Blower Complaint or DNR's ability to defend against same."

At the administrative hearing on Heller's Whistle Blower claim, the SFPS Superintendent Col. Rick Barton testified

that the decision to remove Heller was his alone, and that it was based exclusively on the EEO Officer's probable cause determination concerning Taylor's sexual harassment claim. The ALJ refused to allow Heller to ask Barton about the substance of Taylor's complaint or to challenge the probable cause determination, holding that Heller waived any right to do so when he settled for removal of the reprimand from his record.

Heller was permitted, however, to offer testimony by State Senator Lowell Stoltzfus and former House Delegate Charles McClenahan. Both legislators commended Heller's "excellent" work in improving the marina and were immediately concerned about the impact of his departure. According to both, when Barton, Dunmyer, Taylor–Rogers, and DeCesare were asked why Heller had been removed, they received two different answers.

Sen. Stolzfus testified that as soon as he heard about Heller's transfer, he pressed DeCesare for "more information as to why you are releasing him," because he "was aware of harassment charges which, ... I heard both sides of that story and wasn't entirely satisfied that that was a reality." When Stoltzfus "pushed him further," saying "there's got to be something else," DeCesare "said, well, there's been some financial mismanagement," but "refused to detail me on it."

Del. McClenahan, who was also a marina slipholder, testified that he called Jim Dunmyer, the Assistant Superintendent of SFPS, and also met with Sec. Taylor–Rogers, along with other Lower Shore representatives. Each told him he could not "discuss it with you because it's an EEO claim and I can't give you any information about that." McClenahan then arranged a June 28th meeting on the issue for local government leaders and marina slip holders. The day before, DeCesare informed him by telephone "that Mr. Heller has been removed permanently from Somers Cove and the reason is for budget management." At the meeting, however, Barton stated that "the reason was for an EEO claim." McClenahan "spoke up," saying: "Yesterday I was told by Mr. DeCesare

that it was fiscal problems and now you're telling me this. What is the truth?" At that point, "DeCesare interrupted" McClenahan to say, "I told you that in confidence." McClenahan responded that he just "want[ed] to know what the claim is here. So there were two sides of the story." At the end of the meeting, based on what they were told, "we all left there with a feeling it was an EEO claim."

The ALJ issued a written decision denying Heller Whistle Blower relief for three reasons:

(a) Heller "failed to show that he made a protected disclosure under the Whistle Blower statute;"

(b) Heller "failed to show he was transferred in reprisal for his alleged disclosures;" and

(c) Heller's "allegations of fiscal impropriety were without merit."

Heller petitioned for judicial review. The Circuit Court for Somerset County affirmed the ALJ's decision.

### Appeal

Heller filed this timely appeal, raising three issues for our review, which we restate as follows:

I. Did Heller make a "protected disclosure" within the purview of the Whistle Blower Law?

II. Did the ALJ err in restricting cross-examination and excluding evidence offered by Heller to establish that the EEO finding was used as a pretext for removing him as SCM manager in retaliation for his continuing disclosures regarding violations of NR section 5–908.1?

III. Did the ALJ err in requiring Heller to prove that his disclosures regarding fiscal wrongdoing were "well-founded" rather than merely "reasonably held"?

We answer yes to the first and second questions. Because we must vacate the judgment and remand for further administrative proceedings on Heller's Whistle Blower claim, we briefly address the standard of proof issue for guidance.

## DISCUSSION

### Maryland's Whistle Blower Law

The General Assembly has made it clear that, to ensure that "'government operates in accordance with the law and in avoidance of mismanagement, monetary waste, abuse of authority, and danger to public health and safety[,] .... it is essential that classified State employees be free to disclose impropriety in [the] exercise of their constitutional right of free speech.'" *Montgomery v. Eastern Corr. Institution,* 377 Md. 615, 626, 835 A.2d 169 (2003) (citation omitted). In that respect, "'employees who make [protected] disclosures ... serve the public interest by assisting in the elimination of fraud, waste, abuse, and unnecessary Government expenditures.'" *Id.* at 632, 835 A.2d 169 (quoting legislation enacting analogous federal statute).

"Maryland's Whistle Blower Law ... prohibits a reprisal against a State employee who makes a protected disclosure" of information that he or she reasonably perceives as evidence of a serious abuse of governmental authority, including *inter alia* "gross mismanagement" of public funds and violations of law. *See id.* at 625, 835 A.2d 169. The statute "is designed to protect employees who risk their own personal job security for the benefit of the public." *Willis v. Dep't of Agriculture,* 141 F.3d 1139, 1143 (Fed.Cir.1998). In language similar to its federal counterpart, *see Montgomery,* 377 Md. at 625, 835 A.2d 169, Maryland's statute provides:

[A] supervisor, appointing authority, or the head of a principal unit **may not take** ... **any personnel action as a reprisal against an employee who:**

**(1) discloses information that the employee reasonably believes evidences:**

**(i) an abuse of authority, gross mismanagement, or gross waste of money;** ... **[or]**

**(iii) a violation of law[.]**

SPP § 5–305 (emphasis added).

■ "'The purpose of this subtitle is to prohibit any State appointing authority from using a personnel action as a retal-

iatory measure against an employee ... who has made a disclosure of illegality or impropriety.' " *Montgomery*, 377 Md. at 626, 835 A.2d 169 (quoting preamble to House Bill 616). Thus, whistle blowers must show both a protected disclosure and an impermissible reprisal for that disclosure.[2] *See id.*

## Standard Of Review

■■ Our narrow role in reviewing an administrative adjudication " 'is limited to determining if there is substantial evidence in the record as a whole to support the agency's findings and conclusions, and to determine if the administrative decision is premised upon an erroneous conclusion of law." *Id.* at 625, 835 A.2d 169 (citation omitted). With respect to the agency's interpretation and application of a statute that it administers, we give some deference to the agency's position since it is presumed to draw on its own expertise in the field of its endeavor. *See id.* at 626, 835 A.2d 169. But we need not

---

**2.** The procedural aspects of asserting a Whistle Blower claim are succinctly summarized as follows:

An aggrieved person may elect to file a grievance with the appointing authority or to file a complaint with the Secretary of Personnel within six months of the date the employee knew, or should have known, of the violation. After receiving the complaint the secretary shall investigate it. If the secretary determines that there has been a violation, the secretary shall take remedial action, which may include removing information from the complainant's personnel file, requiring hiring, reinstatement, or promotion of the complainant, requiring payment of backpay, requiring granting the complainant leave or seniority, and recommending or taking disciplinary action against the individual who caused the violation. If the secretary determines there has not been a violation, the secretary shall dismiss the complaint.

The complainant may appeal the decision of the Secretary to the Office of Administrative Hearings within 10 days of receiving it, or may request an appeal if the Secretary fails to issue a decision within 60 days of the filing of the complaint. The Office of Administrative Hearings shall conduct a hearing on the appeal; a complainant who prevails on appeal may be awarded any appropriate relief available from the Secretary of Personnel, and may also recover the costs of litigation and reasonable attorney fees. Either the complainant or the appointing authority may seek judicial review of the decision issued after the hearing.

James O. Castagnera, Andrew P. Morriss, Patrick J. Cihon, *Termination of Employment* § 23:21 (database updated through Aug. 2004)(footnotes omitted). *See* SPP §§ 5–301 *et seq.*

give such weight to an agency's interpretation of a statute when that legislation concerns matters outside its area of expertise. *See Haigley v. Dep't of Health & Mental Hygiene,* 128 Md.App. 194, 216, 736 A.2d 1185 (1999).

## I.

### Heller Made A Protected Disclosure

#### A.

#### Identifying What Is Protected

■ "[M]aking a disclosure protected by the [Whistle Blower Law] fundamentally is different from a government employee complaining about, or grieving, how he or she is treated by his or her supervisor." *Montgomery,* 377 Md. at 633, 835 A.2d 169. This law is not designed to protect an employee who complains about discriminatory, harassing, or other objectionable workplace behavior by supervisors and officials, because there are other administrative and judicial remedies in such circumstances. *See, e.g., id.* at 629–42, 835 A.2d 169 (employee grievance complaining that supervisor's "derogatory demeanor and belittling comments" created hostile work environment was not a protected disclosure).

■ To determine whether a particular disclosure falls within the purview of the statutory protection for revelations of "gross mismanagement," "abuse of authority," and "violations of law," the Court of Appeals has relied on federal law construing the analogous federal statute, the Whistleblower Protection Act (WPA). *See id.* at 640–41, 835 A.2d 169; 5 U.S.C. § 2302(b)(8). In *Montgomery,* the Court of Appeals described the types of improprieties the disclosure of which may be redressed under the Whistle Blower Law.

- "Gross mismanagement" means " 'a management action or inaction that creates a substantial risk of significant adverse impact upon the [government] agency's ability to accomplish its mission.' " *Id.* at 640, 835 A.2d 169 (citation omitted). One example might be a government physician's public complaint about "delays in setting in-

dustry standards [for preventive medicine] which imperiled millions of workers, but benefitted industry." *Montgomery*, 377 Md. at 626 n. 7, 835 A.2d 169.

- "Abuse of authority" is "'the arbitrary or capricious exercise of power by a [government] official or employee that adversely affects the rights of any person or that results in personal gain or advantage to himself or to preferred other persons.'" *Id.* (citation omitted). Examples include "misuse of government equipment or knowing approval of falsified time sheets." *Id.*

- Finally, a disclosure regarding an alleged "violation of law" requires not only an identification of lawbreaking conduct, but also that the reporting employee is "moved by a concern for the public well-being" and has "a reasonable belief that he or she is disclosing such a violation." *Id.* The "reasonable belief" test is an objective one. *See id.*

Thus, a common theme for all protected disclosures is that they must relate to a perceived illegality or impropriety "of the public sort." *See id.* at 641, 835 A.2d 169.

## B.

### Heller's Protected Disclosures

 Heller argues that the circuit court and ALJ erred in ruling that he did not make a protected disclosure. According to Heller, he made many protected disclosures, both written and oral. He asserts that, even though the ALJ did not find Heller's allegations regarding his oral statements to be credible, she committed clear error in finding that none of the documents he offered qualified as a disclosure that he "reasonably believed" would "evidence" "violations of law."

First and foremost, Heller points to a January 13, 2000 memorandum that he and Taylor wrote to Joseph Ward, and copied to DNR's Regional Director, Daryl DeCesare. This memo responded to a December 16, 1999 memo from Ward concerning the marina budget and possible cutbacks that might be necessary to stay within it. In his memo, Heller

claimed to repeat prior complaints about the deleterious effects of what he viewed as DNR's continuing policy and practice of treating SCM as a "cash cow" to fund other DNR facilities, equipment, and personnel:

We now appreciate why our customers were so vocal when we came onboard with their outcry, "A MARINA IS NOT A PARK!" It is very obvious that there is little understanding of what it takes to run Somers Cove Marina. We appear to be chastised on most levels for performance that gave DNR a 180 turn around in one year. We feel that we are being told to turn our backs on the progress we have made and let it regress to its former state.

**Your point is well taken that the present Marina Budget can not support the proper operation of the Marina, especially when we are used as a "CASH COW".** Your balancing [of] the budget—Fiscal Year 2000 Somers Cove Marina revised on 12/6/99 Memo is a superb piece of work that shows **at least $158,000.00 has been removed from the Somers Cove Fund.** Today you informed us that an additional $100,000 was taken out of 01.

**We all know that the FY 1999 attainment should have given the Marina a $623K budget, not the $405K budget that was given us.** Look at the figures:

You found 158K
From 01 add 100K
(Add someone's Non–Compliance with the Associated
Code of MD
Article 5-908.1 Somers Cove Marina
Improvement
Fund 623K—405K =) 218K

**This brings us to a total of at least 476K which we have been shorted.**

**For the past SIX MONTHS we have been telling DNR that a person or persons have been in violation of Article 5-908.1 and we have been told not to pursue this matter. The abuse has not been corrected and in fact has escalated. Please do not expect to hold us accountable for this if it is found in an audit and we are questioned as to why**

we did not "Blow The Whistle". Does this not remind you of past Marina Management practices?

Since January 2, 2000, our attainment has been $60,357.00 and our YTD attainment is $361,359.00. Our projected attainment is $720,000.00.... We will of course comply with your memo and provide the very best service when we are here.... **We are deeply concerned about the impact this will have on the Marina's performance and reputation due to the Office Hours, Office Closures, Guard Coverage and the unavailability of Fuel Service**.... (Emphasis added.)

Heller argues this qualifies as a protected disclosure because it reports violations of NR section 5–908.1's restrictions on the use of funds generated by the marina and on the use of funds appropriated for the marina budget. In his view, the memo satisfies all "elements of a protected disclosure under Section 5–305."

The January 13, 2000 memo alleges that DNR is engaging in prohibited fiscal practices that collectively harm the public interest by misusing money the legislature has earmarked for the marina. It complains about $258,000 in appropriated funds "removed from the Somers Cove Fund," and an additional $218,000 in marina revenue (attainment) that allegedly was not timely credited to the Fund. It explicitly invokes NR section 5–908.1 and discusses a need to "blow the whistle" on such practices. Finally, it decries the harm to public services provided by the marina, and that "the abuse has not been corrected and in fact has escalated."

In her written decision, the ALJ acknowledged that this memo "contains an[ ] allegation ... that Somers Cove funds are being used improperly[.]" She nonetheless concluded that this memo does not qualify as a protected disclosure because it

does not contain any specific information as to where funds were allegedly improperly diverted. In addition, it does not identify to whom the Complainant allegedly made such disclosures during the last six months....

An additional problem with the ... alleged disclosures is that they all appear to be made to Mr. Ward and Mr. DeCesare.... [I]f [Heller] is accusing someone, or more than one person, who works at DNR headquarters in Annapolis of improperly diverting funds, then reporting this to his immediate supervisor and his supervisor does not constitute blowing the whistle. The Complainant would have to make such disclosures to someone who is in a position to address the problem, such as a high ranking official at DNR or to an outside agency that could conduct an investigation.

Thus, I find that the Complainant has failed to show that he made a protected disclosure under the Whistleblower statute.

We find logical and legal errors in this analysis. First, we do not agree that the memo should be disregarded because Heller failed to specify "where funds had allegedly been diverted." Heller alleged that the funds were being used for purposes outside the marina, in violation of NR section 5–908.1. Since that is the only permissible use for marina funds, Heller did not have to trace the funds to another specific destination in Annapolis or elsewhere. In any event, DNR does not dispute that Heller attempted to identify where he believed certain funds had been diverted in previous and subsequent correspondence with DNR management. Indeed, DNR presented the testimony of SFPS Director Barton that he and other DNR managers personally spoke with Heller regarding his concerns about the matters he raised shortly after he came to work at the marina.

Nor should Heller's memo be disregarded on the ground that it failed to identify the persons to whom he reported his concerns during the "six months" prior to this memo. As noted, SFPS Director Barton testified on behalf of DNR that Heller spoke to him about his specific concerns early in his tenure at the marina. Further, even if Heller had not previously disclosed his concerns, it is enough that this memo alleging violations of law was sent to Ward and copied to DeCesare, the two DNR managers who supervised Heller, both of whom had some responsibility for fiscal policies and

practices affecting the marina, and both of whom later participated in the events that led to Heller's removal.[3]

■■■ Finally, we disagree with the ALJ's conclusion that this memo does not constitute blowing the whistle because it was directed to Ward and DeCesare. To be sure, "[t]he purpose of the [Whistle Blower Law] is to encourage government personnel to disclose government wrongdoing to persons who may be in a position to remedy the problem without fearing retaliatory action by their supervisors or those who might be harmed by the disclosures." *Willis,* 141 F.3d at 1143. For that reason, a disclosure "directed to the wrongdoers themselves is normally not viewable as whistleblowing." *Horton v. Dep't of Navy,* 66 F.3d 279, 282 (Fed.Cir.1995), *cert. denied,* 516 U.S. 1176, 116 S.Ct. 1271, 134 L.Ed.2d 218 (1996). Nor are complaints to supervisors voicing mere dissatisfaction with a superior's decision.

> Discussion and even disagreement with supervisors over job-related activities is a normal part of most occupations. It is entirely ordinary for an employee to fairly and reasonably disagree with a supervisor who overturns the employee's decision. In complaining to his supervisors, [the alleged whistleblower] has done no more than voice his dissatisfaction with his superior's decision. He has taken no action to bring an issue to the attention of authorities in a position to correct ... illegal activity.

*Willis,* 141 F.3d at 1143.

■■■ But Heller's complaints were not about wrongdoing by Ward and DeCesare; instead they addressed the policies and practices established by DNR budgeting authorities. Nor

---

**3.** At the administrative hearing, Heller was questioned about a February 7, 2000 memo from Ward responding to Heller's January 13 memo. Heller testified that, although he never saw that memo until discovery in this case, Ward made the same acknowledgement to him orally that he made in his memo-that Ward "agree[d] that Somers Cove has been utilized as a 'cash cow'," "that there needs to be some budget reform," and that he was "tired of hearing about ... 5–908.1." Despite its relevance as evidence of Ward's reaction to Heller's protected disclosure, counsel for Heller did not move the admission of Ward's memo.

are we aware of any requirement that whistle blowers must bypass their immediate supervisors in order to make protected disclosures. In this instance, Heller had good reason to make disclosures to Ward and DeCesare, just as he had also made them to SFPS Superintendent Barton and to DNR budget officials. As a factual matter, both Ward and DeCesare were "high[er] ranking officials at DNR," with management authority to pursue Heller's "cash cow" concerns "up the chain" at DNR. DeCesare managed SFPS facilities throughout the Eastern Shore; Ward managed two of those facilities. Neither one created the official DNR fiscal policies and practices that Heller challenged. Ward signaled that he would pursue the changes sought by Heller by assuring Heller that he agreed that changes in the budget and budgeting process should be made for the benefit of Somers Cove Marina, even if he ultimately did not view the challenged practices as violations of section 5–908.1. We conclude that both Ward and DeCesare were in a position either to correct some of the alleged violations of section 5–908.1, or to bring that special fund restriction to the attention of other DNR managers and/or outside authorities who might succeed in changing DNR's fiscal policy and practices with respect to the marina, as required under *Willis*. Indeed, both necessarily would be involved in any correction of the allegedly illegal DNR practices Heller challenged.[4]

---

4. This is a fundamental distinction between whistle blowing by government employees for the benefit of the public at large and whistle blowing by private sector employees for the benefit of a discrete group of individuals. The language of SPP section 5–305 reflects the General Assembly's policy of encouraging state employees to report information that serves the public interest by exposing and eliminating governmental violations of the law. For that reason, state employees may make disclosures to any governmental authority who is in a position to correct the alleged illegality. *Cf. Willis*, 141 F.3d at 1143. Although Maryland common law in some circumstances affords relief to whistle blowers in the private sector through a cause of action for wrongful discharge in violation of public policy, private whistle blowers who seek to report alleged violations of law must do so to law enforcement authorities. *See Wholey v. Sears Roebuck*, 370 Md. 38, 803 A.2d 482, (2002) (Sears employee who was fired after internally reporting suspected criminal activity of another employee to co-workers and supervi-

In this critical respect, Heller's disclosure differs from other supervisor disclosures that did not qualify as protected disclosures. For example, in *Willis*, a Department of Agriculture inspector complained to his supervisors about their decisions to reverse six of his findings that farms did not comply with USDA conservation plans. The Federal Circuit Court of Appeals held that "Willis's complaints to supervisors are not disclosures of the type the WPA was designed to encourage and protect" because they did "no more than voice his dissatisfaction with his superiors' decision." *Willis*, 141 F.3d at 1143.

In contrast to Willis, Heller did not write the January 13 memo in order to challenge a particular decision by Ward or DeCesare. Rather, his disclosures and complaints were part of a campaign "to bring an issue to the attention of authorities in a position to correct fraudulent or illegal activity" or otherwise "to correct . . . abuse." *Id.* We read Heller's memo as an effort to disclose information that would persuade Ward and DeCesare to participate in "blowing the whistle" on the allegedly continuing violations of section 5–908.1.

For similar reasons, Heller's memo differs from the unprotected disclosures addressed in *Horton*. There, a probationary Marine Corps librarian alleged that he was disciplined for complaining that his supervisor and co-workers slept on the job, were chronically tardy, failed to timely process more than 3,000 books, and falsified time cards. The Federal Circuit agreed that the employee's oral disclosures concerning these practices were not protected because "these criticisms were made directly to the persons about whose behavior Mr. Horton complained, ostensibly for disciplinary or corrective purposes." *Horton*, 66 F.3d at 282.

---

sors did not have a wrongful discharge tort claim because public policy exception to employment at will doctrine applies only to private whistle blowers who report such wrongdoing to police or other law enforcement authorities); *King v. Marriott* Int'l, *Inc.*, 160 Md.App. 689, 866 A.2d 895, 2005 WL 170685, *6 (2005) (Maryland law governing wrongful discharge does not "recognize a public policy in favor of [private] employees who reported corporate wrongdoing to internal authorities like supervisors").

In contrast to Horton, Heller did not seek disciplinary measures against Ward or DeCesare; nor did he complain about a particular decision made by Ward or DeCesare. Rather, Heller sought to persuade and enlist both of his supervisors in correcting DNR accounting, budgeting, and appropriation policies and practices that none of them made unilaterally, but that all three together might collectively seek to change.

Another logical problem with the ALJ's conclusion that Heller did not make a protected disclosure stems from the ALJ overlooking other documents when she concluded that the January 13 memo is the "only" one in which Heller seeks to inform DNR management about the misuse of SCM funds. The record undisputedly shows that, in subsequent correspondence with various DNR managers, Heller provided additional information to support his contentions.

- On February 14, 2000, Heller wrote to DeCesare and Ward that "it is time for a pay-back" of the "$223K [taken by DNR headquarters in Annapolis] from FY99's attainment which is 36% instead of the normal 12%" reserved for DNR overhead.[5]
- On February 18, 2000, Heller responded to a request for an update on the marina budget, providing figures that he asserted would support his complaint that DNR failed to give the marina appropriate credit for its revenue (attainment). In an effort to boost the FY 2001 and FY 2002 budgets, Heller advised Ward and DeCesare that

 SCM's FY99 budget was $448K and our attainment was $623K.

 The budget for FY2000, prepared two years ago, is $405K. Our projected attainment is $710K.
- In a July 19, 2000 self-evaluation, which Heller was instructed to bring to his annual Performance and Planning Evaluation meeting for discussion with Ward, Heller

---

5. Special funds such as the SCM Fund may be charged with a pro rata share of departmental overhead expenses, pursuant to NR section 1–103(b)(2).

responded to the question: "What could be done or changed to help you do your job better?" Heller wrote: "insure compliance with ... 5–908.1 SCM Improvement Fund at all levels." Ward signed the form, indicating that he had reviewed it.

- On November 6, 2000, Heller sent Ward, DeCesare, and another DNR supervisor a memorandum challenging items listed on the "green sheets" that DNR uses to report revenue and expenses. E387. After itemizing specific expenditures and credits, Heller raised a number of "questions and concerns." For example, he pointed to apparently duplicative encumbrances in the amount of $14,317 for a "Ford Pickup" in both FY 2000 and FY 2001, as well as a separate encumbrance for $11,600 in "money to repaint the Museum and the Office Building" for which SCM was charged. Heller also claimed that he still had not been provided a copy of the "actual budget" four and a half months into the fiscal year, that he had not been "included in the budget process," and that the "very comprehensive business plan" prepared for and submitted to DNR was not being followed for budgeting.

We hold that the January 13, 2000 memo and these documents, along with Barton's testimony about his discussions with Heller, collectively establish that Heller disclosed a "violation of law" by identifying the lawbreaking conduct, *i.e.,* the misuse of funds earmarked by the General Assembly for the use of Somers Cove Marina, to DNR managers who were in a position to correct the alleged violations.

DNR does not dispute that Heller's complaints were motivated by his concerns for the marina and its patrons. Thus, Heller also established that he was "moved by a concern for the public well-being."

As to the final requirement for a Whistle Blower claim based on "violation of law" disclosures, we find Heller showed that, at the time he was complaining to DNR managers, he had a reasonable belief that he was disclosing a violation of NR section 5–908.1. The "reasonable belief" stan-

dard requires us to measure objectively what Heller knew and believed at the time he made these disclosures, rather than what DNR officials knew and believed, what Heller later learned, or what DNR and the ALJ ultimately concluded. *See Montgomery*, 377 Md. at 625, 835 A.2d 169; *Horton*, 66 F.3d at 283. Thus, the fact that DNR officials considered Heller's complaints to be without merit does not prevent us from concluding that Heller had an objectively reasonable belief that he was disclosing violations of NR section 5–908.1.

On that mixed question of fact and law, the documents reviewed above clearly profess Heller's conviction that DNR violated section 5–908.1. The problems cited by Heller mirror the problems cited by the General Assembly's auditors, including the improper failure to credit certain DNR accounts and the prohibited transfer of special funds for non-restricted uses.[6] DNR's auditor testified that Heller's concerns, as he

---

6. The first finding in the February 2002 report states that DNR

improperly transferred fiscal year 2000 expenditures totaling approximately $2.8 million between programs, and in some cases between funding sources, because certain programs exceeded their budgeted appropriations and funding was available in the other programs to cover the shortfall. Instead, a budget amendment to transfer the related appropriations should have been requested. These transfers increased total expenditures charged against the General Fund by approximately $351,000. Adequate documentation was not available to support the propriety of the transfers between funding sources. Because many of the Department's special funds are restricted by law for specific purposes, indiscriminate transfers of expenditures could have resulted in special funds being used for inappropriate purposes.

Some of these conditions were commented upon in our two preceding audit reports. (Emphasis added.)

Although DNR's auditor testified without objection that his superior in the Department orally advised him that these findings did not relate to SCM funds, there was no evidence to corroborate that hearsay, from either the superior or the independent author of these reports regarding the specific funds that had been misused. In any event, there was no evidence that Heller realized that the disapproved practices cited in the audits did not relate to Somers Cove Marina, so that, at the time Heller complained that SCM was being "milked" as a "cash cow," a fact finder might determine that he reasonably believed he was disclosing fiscal practices that had been criticized by auditors and prohibited by section 5–908.1.

later restated them in his August 2001 Whistle Blower complaint, were "[v]ery good questions," even if, in his view, a technical investigation and explanation of DNR's funding, accounting, and budgeting process ultimately support DNR's position that there was no "milking" of SCM Funds. The DNR investigator, the ALJ, and the circuit court all emphasized that Heller's complaints lacked merit, though we note that none explained why DNR could use funds earmarked for Somers Cove for personnel or property at other DNR facilities when section 5–908.1 prohibits that. Of significance to this appeal, however, is that none proceeded to consider the material question for purposes of assessing whether Heller's communications qualified as protected disclosures, *i.e.*, whether Heller made them in a good faith belief that SCM funds were being used in violation of section 5–908.1.

We hold that, through his January 13, 2000 memo, his discussions with DNR management, and his other written complaints to his DNR supervisors, Heller made protected disclosures alleging that DNR policies and practices with respect to revenue generated by Somers Cove Marina and funds appropriated for the marina were prohibited by NR section 5–908.1.

## II.

### Heller Must Be Permitted To Challenge DNR's Probable Cause Determination To Show Pretext

As alternative grounds for judgment in favor of DNR, both the ALJ and the circuit court concluded that Heller failed to prove reprisal for any allegedly protected disclosure. This conclusion rests squarely on Col. Barton's testimony that the probable cause determination made by DNR's EEO Officer was the sole reason he removed Heller from his post at the marina.

Heller does not contest that Barton's testimony constitutes substantial evidence in support the ALJ's "no reprisal" finding. Instead, he argues that the ALJ denied him a meaningful opportunity to challenge Barton's testimony. In particular,

Heller contends that the ALJ erred in restricting his cross-examination of Barton and in excluding other evidence concerning Taylor's complaint and the ensuing investigation and probable cause determination. Heller complains that these impermissible restrictions prejudiced his ability to undermine Barton's credibility regarding the basis for his decision to transfer Heller, by preventing him from offering evidence that the probable cause determination rests on a questionable factual, procedural,[7] and legal foundation. We agree with Heller that he is entitled to question Barton and others, and to offer other relevant documents and testimony, in an effort to challenge Barton's testimony regarding his motive for the transfer decision.

In a retaliation case, after the employer offers evidence of a non-retaliatory reason for the challenged personnel action, the employee must be afforded an opportunity to present rebuttal evidence that the employer's asserted reason is pretextual. *See Nerenberg v. RICA of Southern Md.,* 131 Md.App. 646, 662, 750 A.2d 655, *cert. denied,* 360 Md. 275, 757 A.2d 810 (2000); *Killian v. Kinzer,* 123 Md.App. 60, 68, 716 A.2d 1071, *cert. denied,* 352 Md. 311, 721 A.2d 989 (1998). The employee's evidence of pretext is often circumstantial, as it is here.

To prove retaliation for his whistle blowing disclosures, Heller had to show that the disclosures were "a contributing factor" in the decision to transfer him. *See Willis,* 141 F.3d at 1143. In an effort to do that, Heller sought to challenge the credibility of Barton's "sole consideration" testimony with evidence that Taylor's complaint was used as a pretext. We conclude that the ALJ's rulings denied Heller a meaningful opportunity to mount that challenge.

---

7. In challenging the reprimand, Heller asserted, *inter alia,* that "the disciplinary action taken was not in compliance with § 11–106 of the State Personnel and Pensions Article, in that the appointing authority never met with him and considered mitigating circumstances prior to imposing discipline," and "in that it was taken later than 30 days after the appointing authority had acquired knowledge of the alleged misconduct for which the disciplinary action is imposed."

■■■ As a threshold matter, we shall hold that, in settling his grievance, Heller did not waive his right to challenge DNR's probable cause determination during the proceedings on his Whistle Blower claim. To the contrary, by explicitly preserving his right to pursue his Whistle Blower claim, which is necessarily premised on an allegation that Taylor's complaint was "cooked up" with the aid and/or approval of DNR management, Heller also preserved his right to offer evidence that the probable cause determination was an unjustified cover up for reprisal.

At the heart of Heller's attempt to prove pretext is the credibility of Barton's testimony that he had sole responsibility for the decision and that the probable cause determination was the sole consideration in that decision. Thus, the circumstances surrounding Taylor's complaint and DNR's response to it are highly relevant to the critical issue of whether Heller's protected disclosures regarding violations of section 5–908.1 were a contributing factor.

The ALJ's restrictions on Col. Barton's cross-examination prevented Heller from challenging Barton's credibility by exploring the circumstances surrounding Taylor's complaint and DNR's response to it.[8] Although Heller was permitted to elicit from Barton that he had no "personal knowledge" regarding Taylor's complaint or the DNR investigation, and to present testimony by Sen. Stoltzfus and Del. McClenahan that DeCesare personally acknowledged to them that Heller was removed for fiscal and budgeting reasons, the ALJ otherwise prevented counsel from challenging Barton's testimony that he alone made the decision to transfer Heller and that he made the decision to permanently transfer and demote Heller based "solely" on the May 30, 2001 probable cause determination.

---

**8.** The ALJ's rulings did not preclude Heller from questioning DNR officials about other relevant matters, including (1) direct or indirect communications concerning Heller's complaints about violations of section 5–908.1; and (2) knowledge of either the public complaints regarding violations of section 5–908.1, the 1999 legislative audit, or the audit that was underway when Heller was removed.

For example, Heller should have been permitted to question Barton about his role, if any, in the preliminary decision to transfer Heller prior to either the EEO investigation or the probable cause determination; a reasonable fact finder could view evidence that Barton participated, recommended, or supported this immediate action as evidence that the investigation and probable cause determination were merely *post hoc* "window dressing." In addition, Heller was entitled to explore with Barton and other DNR officials whether, in light of DNR policy and past practices, the substance of Taylor's complaint merited the investigation and disciplinary action that was taken against Heller; for example, evidence that less drastic measures are preferred DNR policy or practice for complaints of "discomfort" due to fear that a complaint may be lodged in the future might support Heller's pretext claim. Similarly, Heller was entitled to question Barton and other DNR officials about why his reports alleging that Taylor was seeking a personal relationship or an opportunity to assert a hostile environment claim were apparently disregarded for months, whereas Taylor's complaint received immediate attention and action.

Such evidence is relevant to the extent it supports or refutes Heller's contention that DNR management encouraged and/or seized upon Taylor's complaint as an opportunity to silence Heller's persistent disclosures concerning violations of section 5–908.1, at a time when outside scrutiny on that issue was "heating up" in the public and legislative arenas. In concluding that Barton alone acted on the sole basis of the probable cause determination, the ALJ rejected Heller's pretextual reprisal claim. Because the evidentiary record upon which the ALJ made her factual determination that there was no reprisal did not include relevant evidence that should have been considered in making that determination, we must remand for a *de novo* administrative hearing on the fundamental factual issues raised by Heller.[9] In doing so, we emphasize

---

9. We are not persuaded otherwise by the fact that the Whistle Blower Law does not prevent DNR from taking "a personnel action that would

that we do not express any view regarding the merits of Heller's Whistle Blower claim.

## III.

### "Reasonable Belief" Standard For Whistle Blowers

The ALJ found that Heller's "allegations of fiscal improprie-ty were without merit." Heller argues that this is the wrong standard for evaluating a Whistle Blower claim because the law protects not only employees who turn out to report true violations of the law, but also employees who disclose "infor-mation that the employee reasonably believes evidences" a violation of law. *See Fine v. Ryan Int'l Airlines,* 305 F.3d 746, 752 (7th Cir.2002)(employee alleging retaliation need not prove actual governmental abuse, only employee's reasonable belief that there was abuse). Thus, Heller asserts, he is not obligated to show that his allegations of impropriety and illegality are meritorious, but merely to show that, at the time he made them, they were "well-founded."

▬ DNR agrees that the correct standard for a Whistle Blower claim is whether the employee had an objectively reasonable belief that his disclosure evidenced a violation. *See Montgomery,* 377 Md. at 641, 835 A.2d 169. On remand, that standard must be applied.

**JUDGMENT VACATED AND CASE REMANDED TO THE CIRCUIT COURT FOR SOMERSET COUNTY WITH INSTRUCTIONS TO REMAND THE CASE TO**

---

have been taken regardless of a disclosure of information," or that an executive branch employee who violates State sexual harassment and gender discrimination policies may be disciplined. *See* SPP § 5–215; SPP § 5–302(b). These rules do not apply as a matter of law, at least as long as there are material disputes over whether Heller violated State discrimination policies and whether the untested probable cause deter-mination was a legitimate justification for the transfer. As explained above, the dispute over whether any gender discrimination occurred was not finally litigated due to the settlement. As for whether the probable cause determination, by itself, is the sole and justified reason for Heller's transfer, Heller is entitled to a new administrative hearing on those questions.

THE DEPARTMENT OF MANAGEMENT AND BUDGET FOR FURTHER ADMINISTRATIVE PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.